[Civ. No. 1656.   Third Appellate District.—May 30, 1917.]

THE PEOPLE ex rel. HUGH B. BRADFORD, etc., Respondent, v. ANDRE BARBIERE et al., Appellants.

REDLIGHT ABATEMENT LAW — FORFEITURES AND PROCEDURE — ACT CONSTITUTIONAL.—The "Redlight Abatement Law" of 1913 (Stats. 1913, pp. 20–22), which in its general object is no different from that of sections 315 and 316 of the Penal Code, and which differs in a general sense from those sections only in that its design was to establish a summary method, through the civil processes of the law, for putting a stop to the maintenance of houses of ill fame and other places where acts of lewdness and prostitution are habitually practiced and carried on as a business, is a valid exercise of the police power, and the provisions contained in such act as to forfeitures and procedure do not violate any of the constitutional guaranties of property owners.

ID.—NATURE OF ACTION UNDER STATUTE — USE OF BUILDING FOR IMMORAL PURPOSES — LACK OF KNOWLEDGE OF PROPERTY OWNER.— The action authorized by the statute is *in rem*, or against the property used in the maintenance of the nuisance, as well as *in personam*, or against the person maintaining it, and while, therefore, the owner, having no actual knowledge of the business carried on in his building, might not personally be bound for the costs, the building and furniture may nevertheless be proceeded against and subjected to the forfeitures prescribed by the statute.

ID.—DISOBEDIENCE OF ORDER OF ABATEMENT—CONTEMPT—PUNISHMENT. The provision of the statute authorizing the punishment as for contempt of any person guilty of disobedience to the order of abatement or the permanent injunction is not void, because, in point of severity, it conflicts with section 1218 of the Code of Civil Procedure, which fixes a penalty for contempts generally.

APPEAL from a judgment of the Superior Court of Sacramento County.   Charles O. Busick, Judge.

The facts are stated in the opinion of the court.

R. P. Talbot, for Appellants.

Hugh B. Bradford, District Attorney, and J. R. Hughes, Assistant District Attorney, for Respondent.

HART, J.—This action was instituted against the respondents under what is commonly known as the "Redlight Abate-

ment Law," passed by the legislature of 1913, and entitled, "An act declaring all buildings and places nuisances wherein or upon which acts of lewdness, assignation or prostitution are held or occur or which are used for such purposes, and providing for the abatement and prevention of such nuisances by injunction and otherwise." (Stats. 1913, pp. 20–22.)

It is alleged in the petition that the respondents, Andre Barbiere and Ernestine Moreau, are the owners, respectively, and in severalty, of two pieces of real property, upon which there stand two separate buildings, the one adjoining the other, situated in the block bounded by L and M and Second and Third Streets, in the city of Sacramento. It is charged that the respondent, Moreau, had, previously to the institution of this proceeding, leased to one of the fictitiously named respondents, whose true name the evidence at the trial disclosed to be Pugne Maddalena, for the term of one year, commencing January 1, 1915, the building owned by her and above referred to, together with the furniture therein contained, it being expressly provided in the lease that said building and furniture were to be used by the lessee as a lodging-house; that, at the time this action was brought, on August 12, 1915, and for some time prior thereto, said premises (referring to both pieces described in the petition) "were and now are used for the purpose of lewdness, assignation, and prostitution, and said property and said buildings were and now are a nuisance under the laws of the state of California; that there is on said property a common passageway from one property to the other and from one building to the other erected upon said property and used by the occupants of each building."

The petition alleges that the respondent, Angelo Flores, "is the owner of the furniture, fixtures, and other movable property situated in said building described herein and owned by the said respondent, Andre Barbiere," and that certain fictitiously named persons are the owners of the furniture, fixtures, and other movable property situated in the building alleged to be owned by the said Moreau, "and that said furniture, fixtures, etc., are used in conducting, maintaining, aiding, and abetting said nuisance," etc.

The respondents, Barbiere and Moreau, by their joint answer, admitted their ownership, respectively, of the two pieces of property described in the complaint, but denied that said properties, either singly or together, were used for purposes

of lewdness or prostitution. Moreau admits the lease of her premises to the said Maddalena as alleged in the complaint, but denies that said Maddalena at any time used the premises or any part thereof or the furniture therein contained for the purposes of prostitution assignation, or lewdness of any kind or character.

The respondent, Pugne Maddalena, answering the complaint for herself, admits the making of the lease mentioned above, and that, as lessee under said instrument, she occupied the premises and building belonging to the said Moreau, but denies that she at any time used said premises or building, or any part thereof, for the purpose of carrying on or conducting the business of prostitution or that any acts of lewdness of any character were practiced therein. She admits that there exists a passageway between the property occupied by her and the property of Barbiere, by means of which persons may pass from one of the said buildings to the other, but denies that said passageway is or ever was used "by the occupants of said building or at all."

The court's findings and conclusions of law were in accord with the charges set forth in the complaint, and judgment was thereupon entered as follows: That the two several premises described in the complaint had been and, at the time of the issuance of the injunction *pendente lite,* were being used for the purposes of prostitution and assignation; that said premises as so maintained and conducted constitute a public nuisance; that the temporary injunction be made permanent, perpetually abating said nuisance; that the premises or the buildings be closed for the period of one year, unless otherwise ordered by the court, and that the furniture, fixtures, etc., which it was found were used in the building of Moreau for the purpose of carrying on the business of prostitution, etc., be sold, in accordance with the terms of the statute under which this proceeding was instituted and is prosecuted.

Subsequently to the entry of the judgment, the court, upon the application of the said Barbiere and Moreau, and the filing by them of a bond, conditioned as prescribed by section 9 of the statute, ordered that the premises alleged in the complaint to be owned by Barbiere in severalty be delivered to said Barbiere and Moreau, and that "the aforesaid order of abatement be canceled, so far as the same may relate to the said property."

This appeal is prosecuted from the judgment by the respondents, Barbiere, Moreau, and Maddalena.

The points first presented and discussed by the appellants are in disparagement of the constitutional integrity of the act under which this proceeding was inaugurated and prosecuted. It is claimed that the act contravenes the mandates of the fourteenth amendment to the federal constitution, in that the effect of the authority or power vested in the court by the act to order a building, found to be used for the inhibited purposes, to be closed and not to be used for the period of one year, is, when exercised, to deprive the owner of such property thereof without due process of law. In connection with the point thus stated, appellants assail the act upon other constitutional grounds, claiming that the penalties or consequences authorized by its provisions to be visited upon those setting its mandates at defiance are unreasonably harsh and severe. It is further contended that the provision of the act authorizing the punishment as for contempt of any person guilty of disobedience to the order of abatement or the permanent injunction is, for reasons to be hereafter briefly noticed, void and not enforceable.

Other specific points made will be stated as we take them up for consideration.

The first section of the act in question defines or describes the persons and buildings coming within the purview of its provisions and inhibitions.

The second section provides: ''Every building or place used for the purpose of lewdness, assignation or prostitution and every building or place wherein or upon which acts of lewdness, assignation, or prostitution are held or occur, is a nuisance which shall be enjoined, abated and prevented as hereinafter provided, whether the same be a public or a private nuisance.''

The third section provides that whenever there is reason to believe that such nuisance is maintained or exists in any county or city and county, the district attorney of such county must, in the name of the people, or any citizen of the state residing in such county may in his own name, maintain an action in equity to abate and perpetually enjoin the person maintaining such nuisance, and the owner or lessee or agent of the place or building where such nuisance exists from main-

taining and permitting the nuisance to be maintained or continued.

Section 4 provides that, when the existence of such nuisance is shown by a verified complaint or an affidavit, the court or judge may issue a temporary injunction for its abatement.

Section 6 reads: "Any violation or disobedience of either any injunction or order expressly provided for by this act shall be punished as a contempt of court by a fine of not less than two hundred dollars nor more than one thousand dollars, or by imprisonment in the county jail for not less than one month nor more than six months, or by both such fine and imprisonment."

The seventh section provides that, when the existence of the nuisance has been established in the action, "an order of abatement shall be entered as a part of the judgment in the case, which order shall direct the removal from the building or place of all fixtures, musical instruments and movable property used in conducting, maintaining, aiding or abetting the nuisance, and shall direct the sale thereof in the manner provided for the sale of chattels under execution, and the effectual closing of the building or place against its use for any purpose, and so keeping it closed for a period of one year, unless sooner released, as hereinafter provided. While such order remains in effect as to closing, such building or place shall be and remain in the custody of the court."

The eighth section provides for the disposition of the proceeds of the sale of the chattels, the same to be used in the payment of the fees and costs accruing by reason of the action and the sale, and the balance, if there be any after the fees and costs are paid, to be turned over to the owner of the property sold.

The ninth section provides that if the owner of the building or premises has not been guilty of any contempt of court in the proceedings, and appears and pays all costs, fees, and allowances which are a lien on the building or place, and files a bond in full value of the property, to be ascertained by the court, with satisfactory sureties, "conditioned that he will immediately abate any such nuisance that may exist at such building or place and prevent the same from being established or kept thereat within a period of one year thereafter, the court, or judge thereof, may, if satisfied with his good faith, order the premises, closed under the order of abatement, to be

delivered to said owner, and said order of abatement canceled so far as the same may relate to said property. . . . "

The legislation with which we are here concerned involves an attempt at the treatment of a sociological problem whose solution has puzzled the best thought of mankind from the beginning of organized society, if not from the beginning of the world. Whether by human legislation the permanent or even partial correction of the evil sought to be stamped out by the law may be accomplished is not a question of pertinent discussion here. All that is required of us in the consideration of this appeal is to ascertain and determine, in the first place, whether the act in question constitutes a valid exercise of legislative power, and if so, whether, in the second place, the specific methods employed for the concrete application of such power are valid or otherwise.

The general object of the legislation involved in the said act is, it is obvious, no different from that of certain penal statutes which have been upon the pages of our law books for many years. Sections 315 and 316 of the Penal Code declare is to be a misdemeanor for any person to keep or reside in a house of ill fame in this state, resorted to for purposes of prostitution or lewdness, or to keep a disorderly house, or any house for the purpose of assignation or prostitution. And the last-named section further places a ban upon the act of letting or leasing property to another, where the owner of the property knows that the same is to be used for the purpose of assignation or prostitution, and makes such act a misdemeanor.

The abatement act is only in furtherance of the policy of the state as established by the sections of the Penal Code above adverted to, and differs in a general sense from those sections only in that, unlike those sections, its design was to establish a summary method, through the civil processes of the law, for putting a stop to the maintenance of houses of ill fame, as that designation is commonly understood, and other like places, where acts of lewdness and prostitution are habitually practiced and carried on as a business. The act, in other words, represents only the concrete application of the state's power of police, and, preferably to the courts of criminal jurisdiction, invokes the aid of the civil courts as the most certain instrumentality for the suppression of an evil which has been by the legislature deemed of so pernicious a nature, in its

effect upon society, as to have actuated that body in denouncing its practice as a public crime. That it is within the competence of legislative authority to invest the civil courts with such power or jurisdiction, is an unquestioned and unquestionable proposition, and, in assigning to the equity side of our courts the exercise of that power, the legislature acted with manifest wisdom, since, by reason of their peculiar constitution and the nature of their remedial power, the equity courts may, with an alacrity equal to the efficacy of the operation of their judicial pronouncements, afford the relief to which the public are entitled under the act under whose provisions this proceeding was initiated and its object consummated in the court below. But the power in a court of equity to abate nuisances, whether public or private, has always been among the most conspicuous of the legal attributes of that tribunal, and the power specially conferred upon it by the act in question is new or novel to that forum in this state only in the nature of the particular subject to which it is thus authorized to be applied. The remedy provided is as ancient as chancery itself, and the fact that the particular nuisance against the maintenance or existence of which the act authorizes equity to apply the force of its remedial power is itself a crime and a law remedy thus provided for its extinction is no argument against the legality or even propriety of placing it within the cognizance of that jurisdiction. Quite to the contrary, the fact that the act of maintaining the nuisance is itself a crime, which would, if it were not in and of itself already one, class it as a nuisance *per se,* furnishes the most forcible reason for authorizing the interposition of equity, to the end that its suppression may speedily and *effectually* be accomplished—a result which experience has demonstrated may not be expected from the courts of criminal jurisdiction, whose proceedings, more from the system itself than from the course of the ministers of the law in conducting those tribunals, are too often characterized by delays and mistrials, and whose judgments involve only the imposition of mere penalties without, as is more frequently true than not, having the effect of permanently abating the nuisance itself.

The only question, then, that can arise with respect to such legislation as is involved in the act in question is whether the consequences of the power conferred, when exercised and applied, are violative of the constitutional guaranties of the

owners of the property affected by a decree granted under the act. We cannot say that such is the case. Indeed, similar and even identical legislation has been in other jurisdictions painstakingly examined and upheld as against the very constitutional objections urged against the statute in the case at bar.

So far as we are aware, Iowa was the first state to adopt a statute such as the one before us. There has been cited here no decision of the supreme court of that state in which the act has been considered. But Iowa has liquor and cigarette laws, whose general purpose is precisely and whose provisions as to forfeiture, etc., are substantially the same as are those of the statute under consideration, and they have been sustained as a valid exercise of the police power. (See *Judge* v. *Kribs*, 71 Iowa, 183, [32 N. W. 324]; *Tuttle* v. *Bunting*, 147 Iowa, 153, [125 N. W. 844]; *Hodge* v. *Muscatine County*, 121 Iowa, 482, [104 Am. St. Rep. 304, 67 L. R. A. 624, 96 N. W. 968]; 196 U. S. 276, [49 L. Ed. 477, 25 Sup. Ct. Rep. 237].)

In the states of Minnesota, Nebraska, and Washington, however, where precisely similar statutes exist, said statutes have been considered by the higher courts of those states under objections urged against their validity for exactly the same reasons that are urged against the validity of the statute before us.

In *State* v. *Gilbert*, 126 Minn. 95, [147 N. W. 953], the supreme court of Minnesota, reviewing the abatement statute of that state, has this to say, quoting from the syllabi of the opinion: "The act is not invalid, as entailing unconstitutional forfeitures of estate upon conviction for an offense, the legislature having power to provide for specific forfeitures for specific acts, including total destruction, in a proper case, of property *per se* innocent; nor does it authorize summary forfeitures and penalties without sufficient notice and hearing. The act, in its remedial details, as well as in its general purpose, is a proper exercise of the police power, under the test that a police measure must fairly tend to accomplish the purpose of its enactment, and must not go beyond the reasonable demands of the occasion."

In *State* v. *Jerome*, 80 Wash. 261, [141 Pac. 753], the supreme court of Washington holds that the abatement law of that state is a valid exercise of the police power, and that the provisions therein contained, which are similar to those

in our law, as to forfeitures and procedure in no way contravene the constitutional rights or guaranties of owners of the property upon which the decree authorized by the act is intended to operate.

In *State* v. *Fanning*, 96 Neb. 123, [147 N. W. 215], the supreme court of Nebraska, having under consideration the abatement law of that state, said, among other things: "It is urged that the law is unconstitutional and void for a number of reasons assigned, among others, that it deprives a citizen of his property without trial by jury, and without due process of law, and is a denial of the equal protection of the law. The powers of a court of equity to abate nuisances and to deprive persons of property used in the perpetration thereof have existed for centuries, and have been exercised in this state since its organization. Before the enactment of the statute under which these proceedings are brought, this power was exerted in the case of *Siefert* v. *Dillon*, 83 Neb. 322, [131 Am. St. Rep. 642, 17 Ann. Cas. 1126, 19 L. R. A. (N. S.) 1018, 119 N. W. 686], to close up a bawdy-house as a nuisance, and to prevent its use for such purpose in the future. The provisions of the Bill of Rights with respect to trial by jury have no application to remedies in courts of equity existing at the time of its adoption (*Littleton* v. *Fritz*, 65 Iowa, 488, [54 Am. Rep. 19, 22 N. W. 641]), and in such cases due process of law is observed by using the equitable remedies existing concurrent with the strictly legal one of trial by jury, or those provided by statute law which afford notice and an opportunity to defend."

We are satisfied with the conclusion declared in the above cases and the reasons upon which it is predicated, and both the conclusion and the reasons therefor have cogent and, indeed, direct application to the case here.

But it is contended that neither the owner of a building which has been declared a nuisance under the statute nor the building itself can be bound by the adjudication unless such owner has knowledge that such building has been and is being used for purposes interdicted by the statute, and that it is not shown here that the owners of the buildings had knowledge of the character of the illicit uses to which they were being put. The action authorized by the statute is *in rem*, or against the property used in the maintenance of the nuisance, as well as *in personam*, or against the person maintaining it,

and while, therefore, the owner, having no actual knowledge of the character of the business carried on in his building, might not personally be bound for the costs, the building and furniture may nevertheless be proceeded against and subjected to the forfeitures prescribed by the statute. If, therefore, a building or other property is so used as to make it a nuisance under the statute, the nuisance may be abated and the property, if personal, confiscated, and if real, subjected to the consequences of reasonable forfeitures, notwithstanding that the owner had no knowledge that it was used for the unlawful purpose constituting the nuisance. (*Commonwealth* v. *Howe*, 13 Gray (Mass.), 26; *Hodge* v. *Muscatine County*, 121 Iowa, 482, [104 Am. St. Rep. 304, 67 L. R. A. 624, 96 N. W. 968]; *State* v. *Gilbert*, 126 Minn. 95, [147 N. W. 953]; *State* v. *Fanning*, 96 Neb. 123, [147 N. W. 215]; *Tenement House Department* v. *McDevitt*, 215 N. Y. 150, [Ann. Cas. 1917A, 455, 109 N. E. 88].) But it has been held that "the owner of property is presumed to know the business conducted thereon." (*Hodge* v. *Muscatine County*, 121 Iowa, 482, [104 Am. St. Rep. 304, 67 L. R. A. 624, 96 N. W. 968]; 196 U. S. 276, [49 L. Ed. 477, 25 Sup. Ct. Rep. 237]; *State* v. *Gilbert*, 126 Minn. 95, [147 N. W. 953].)

In the instant case, however, we are justified in saying that a fair and reasonable inference arises from the evidence that both Barbiere and Moreau knew at all times of the immoral uses to which the condemned buildings were being put.

It is further contended that, because in point of severity there is a conflict between the provisions of the abatement law prescribing a penalty as for contempt for the violation of any injunction or order authorized thereunder and section 1218 of the Code of Civil Procedure, fixing a penalty for contempts generally, the former provision is invalid, and it is argued that said provision is so connected with the entire act as that the necessary effect of its invalidity is to render the act as a whole void and nugatory. The contention is obviously untenable and the argument likewise fallacious. Assuming for the purposes of the argument that the section is void for the reason advanced, it is as clear as any proposition may be made that the provision (section 6) of the abatement law relative to contempts is entirely independent of and severable from the other parts of the statute, which are clearly valid, and that the valid parts are capable of enforcement so as to effectu-

ate the paramount object of the statute with the section thereof relating to contempts of the court's adjudications or orders entirely eliminated therefrom. In other words, section 6 and the other parts of the statute are not interdependent, or the latter dependent for its validity upon the former, section 6 merely furnishing a remedy for the more effectual enforcement of all the terms of the court's decree under the law— a remedy which, were it not specially provided by the statute itself, would be supplied by the very section of the Code of Civil Procedure, with whose provisions it is here claimed section 6 of the abatement law conflicts. But we do not acquiesce in the view that section 6 of the abatement law either affects or is affected by the code section referred to. We know of no constitutional limitation upon the right of the legislature to fix reasonable penalties for contempts of the judgments, decrees, orders, or processes of courts of justice, and, in admeasuring such punishments, to assign, as it may do and has done in cases of public crime, to certain acts of contempt a greater or less penalty than is annexed to others, according to the nature of the contempt with respect to the subject matter of the adjudication violated and the consequences of such violation to the public or to individual rights. If, however, the effect of the conflict is to destroy the force or validity of the one or the other of the two provisions, it is the section of the code and not that of the abatement law which is thus affected, since the latter is the later legislative expression upon the subject.

The last point to which attention will be given is that the evidence fails to support the conclusion of the trial court, as embodied in its findings of fact, that the building owned by Barbiere was used in connection with the building of Moreau for the immoral purposes described in the complaint. It is not considered necessary to present herein a detailed statement of the testimony upon this point, or any extended synopsis thereof, to show, as a careful examination of the testimony has convinced us is true, that this point is not well founded. It is sufficient to say that it was clearly made to appear that there was a common passageway maintained from the Barbiere building to the Moreau building, through and by means of which entrance to both buildings was habitually effected by those entering therein, and that said passageway was through the saloon in the Barbiere building, thence to the

apartments maintained by the Maddalena woman in the Moreau building. The fact is, as the evidence shows, that the respondent who is designated in the complaint as "Ernestine Moreau" is the wife of the respondent, Barbiere, and, as seen, the testimony appears to show that the two buildings, the one owned by Barbiere and the other by his wife, are so connected together and attached to each other that the two may be used as one building; that Barbiere, as seen, conducted a saloon in his building, while the other building, as conducted by Maddalena, was used for the purpose of prostitution and assignation; that visitors to the Maddalena apartments entered said apartments through the entrance passing through the saloon. Moreover, from the whole record and the general situation as presented, it is fairly inferable that the entrance into the Maddalena apartments through the saloon was maintained not alone for the purpose of providing for the visitors and inmates easy and unobserved access to the Maddalena apartments, which the evidence plainly enough shows were conducted as a place of prostitution, but also for the purpose of readily furnishing the inmates of and frequenters to the apartments with liquors and wines, and of facilitating the sale of those articles by Barbiere to those persons.

There is, in brief, testimony of numerous circumstances tending to establish the proposition that the saloon business of Barbiere and the assignation apartments of Maddalena were used to facilitate the business of each; but we need not take the time and space to recite them herein. We are satisfied that both buildings were used for the illicit purposes denounced by the statute.

The record has discovered to us no reason for molesting the judgment, and it is accordingly affirmed.

Chipman, P. J., and Burnett, J., concurred.