[Civ. No. 1771.   Third Appellate District.—June 3, 1918.]

THE PEOPLE, Respondent, v. CHAS. F. DILLMAN et al., as Trustees, etc., Appellants.

NUISANCE—ABATEMENT UNDER RED-LIGHT ACT—DISMISSAL OF PROCEEDING.—In an action to enjoin the use of property for immoral purposes under the Red-light Abatement Act, where it is shown that the nuisance had been abated before the action was commenced, the proceeding will be dismissed.

ID.—EVIDENCE—EXPLANATION OF VISITOR—TESTIMONY OF POLICE OFFICERS—HEARSAY.—In such an action, testimony of police officers, who raided the premises, that a man found in the room of an inmate of the house had told them that he was there for an immoral purpose was hearsay and inadmissible.

Id.—Improper Corroboration.—In such an action, it is not proper to corroborate the testimony of a police officer, by permitting another officer to testify that he had heard the testimony and that it was true in all particulars.

Id.—Decree Enjoining Use of Property for Immoral Purposes — Title not Clouded.—A decree under the Red-light Abatement Act enjoining defendants from using certain real property for immoral purposes, but not closing the premises or ordering the sale of furniture or taxing costs, is not prejudicial, as clouding the title to the property.

APPEAL from a judgment of the Superior Court of Sacramento County.   Peter J. Shields, Judge.

The facts are stated in the opinion of the court.

White, Miller, Needham & Harber, for Appellants.

Hugh B. Bradford, for Respondent.

HART, J.—The action was commenced on July 13, 1917, by the district attorney of the county of Sacramento to secure an injunction enjoining the use of certain real property in the city of Sacramento belonging to appellant, Marguerite Home, for immoral purposes under the so-called "Red-light Abatement Act." (Stats. 1913, p. 20.)   A trial was had and the court found that on and prior to July 8, 1917, the building referred to was used for the purposes of lewdness, assignation, and prostitution, and was a nuisance.   Judgment was entered that appellants "do perpetually and absolutely desist and refrain from conducting and maintaining and using, for the purposes of lewdness, assignation, and prostitution," said premises.   The appeal is from said judgment.

The facts are: The building, which the petition alleges was used for purposes of assignation and prostitution, is situated in the city of Sacramento and is the property of the "Marguerite Home," an institution founded and maintained for the care and support of aged women, and of which the appellants Dillman and Mebius are trustees.   On the ninth day of March, 1916, the trustees leased said premises for the term of three years, beginning on said date, to one Peter Gilarducci, said lease being evidenced by an instrument in writing, duly executed by the parties thereto.   Among the provisions of the

lease is one to the effect that the lessee shall not let or underlet the whole or any part of said premises without the written consent of the lessors. Some time after the execution of said lease, Gilarducci, with the consent of the trustees, sublet the building to two men by the names, respectively, of Valentina and Gabriella. It appears, however, that, on the sixteenth day of November, 1916, Gilarducci, without the consent or knowledge of the lessors, sublet the upper floor of the building to one Joe Caci. This sublease was in writing and referred to the building as a "lodging-house." The lower floor of the building was used as a saloon by Valentina and Gabriella.

On the eighth day of July, 1917, the portion of the premises so sublet to Caci was raided by the police, who found in one of the rooms thereof a woman named and known to the police as Kitty Gray, who was also known by the officers to be a prostitute. The officers thereupon placed the woman under arrest. She was the only female found by the officers in the building on that occasion. On the thirteenth day of July, 1917, five days subsequently to the raid above referred to, this action was begun, by the district attorney of Sacramento County under the act of the legislature above mentioned, which is popularly known as the "Red-light Abatement Act."

Upon the close of the case of the people the defendants asked for a nonsuit on the ground that the evidence was insufficient to make out a case under the act in question. The court denied this motion, and here the appellants complain: 1. That the evidence does not support the findings; 2. That, conceding that, on the eighth day of July, 1917, the time at which the raid was made and the said Kitty Gray put under arrest, the premises were used for the purposes of prostitution, and thus a nuisance therein maintained, the evidence clearly and unquestionably shows that such nuisance was abated by the tenants, Valentina and Gabriella, themselves, and that, therefore, at the time this proceeding was instituted, there existed in and on the premises no nuisance to abate; 3. That the trial court made certain erroneous rulings respecting the evidence from which serious detriment to the rights of the defendants in the trial resulted.

The testimony introduced by the people was given by the police officers who raided the premises on the eighth day of July, 1917, and in substance is as follows: That, on going to the upper floor of the building, they met the woman, Kitty

Gray, just as she was emerging into the hallway from her room. Asked by the officers whether there was anyone in her room, she replied in the negative, but they proceeded on into her room and therein found a man who was in the act of pulling his pantaloons from his lower limbs to his waist. This man, whose name was not given, stated that he had only a moment previously given the woman some money upon an agreement that she would have sexual intercourse with him, but declared that up to that time no sexual relations between them had been had. One of the officers testified that, at some time before the eighth day of July, the premises had been raided by the police and the place closed. At that time there were three or four women of bad repute in the building, one of whom was Kitty Gray, who was then cautioned by the officers against resuming in Sacramento her occupation as a prostitute. The same officer (and the only officer who so testified) said that the general reputation of the premises prior to and on the eighth day of July was that it was a house of prostitution. Each of the officers testified that he did not know, nor had he heard, of any acts of lewdness or prostitution being committed in said building after the said eighth day of July, and that so far as he knew no such acts had been committed in the building after that date.

The foregoing embraces a synoptical statement of all the testimony presented by the people in support of the charge set out in the petition.

The defendant, Dillman, testifying for the defense, testified that he did not know Caci had been given a sublease of the upper portion of the building by Gilarducci until after the Gray woman was arrested on the eighth day of July; that the sublease to Caci was made without the consent of the trustees of the Marguerite Home; that, upon learning of the raid by the officers on the eighth day of July, Valentina and Gabriella dispossessed and put out of the premises the said Caci; that, so far as he knew, there had been no prostitution or lewdness practiced in the building since the said eighth day of July.

The court found that on and for some time prior to the eighth day of July, 1917, the premises in question were used for the purposes of lewdness, assignation, and prostitution, and that said building was a nuisance under the laws of this state. The judgment thereupon entered decrees that the defendant, and their agents, etc., ''do perpetually and abso-

lutely desist and refrain from conducting and maintaining and using, for the purposes of lewdness, assignation, and prostitution,'' the said premises.

It is plainly apparent from the evidence that the trustees of the Marguerite Home were entirely ignorant at all times of the immoral use to which the upper portion of the building was put by the sublessee, Caci, and we think it is very clear that had they known that Caci or any other person was using the building for the purpose of carrying on the immoral traffic which appears to have been practiced in said building, the trustees would promptly have evicted the transgressor and have stopped the illicit business. But we are further of the opinion that the evidence is sufficient to support the decision of the trial court.

It may be observed that it must be true, as counsel for the appellants contend, that where a nuisance has been abated before action to abate it has commenced and it does not exist at that time, the trial of the action will be without a foundation for its support and utterly barren of substantial results, for in such case, obviously, there would be no nuisance to abate. And if there had been evidence sufficient to support a finding that the nuisance had been abated before this action was commenced, we doubt not that the court below would have dismissed the proceeding or found against the averments of the petition.

It is true that one of the trustees testified that upon learning of the raiding of the building by the officers and of the discovery that prostitution was going on therein, on the eighth day of July, 1917, Valentina & Gabriella, subtenants of the building by consent of the trustees, immediately put Caci out of the possession of the upper story of the building and thus stopped further prostitution therein. It was further made to appear that, so far as the officers or trustees knew or were advised, prostitution or other acts of lewdness were not practiced in the building after said date. But, while this is all true, there is by the law committed to trial courts, upon the question of the weight or evidentiary value of testimony, a very large discretion, with which interference by courts of appeal is never justified or justifiable unless upon the face of the testimony itself as necessarily it must be presented to the latter courts it may be said to be unworthy of belief or entitled to no weight. In this case, however, the trial judge was not

required to, and most probably did not, disbelieve or discredit the testimony of the appellants who testified to the suppression of the nuisance by the subtenants, Valentina & Gabriella, on the 8th of July, upon learning of its maintenance upon the premises. There was testimony, as we have shown, which tended to establish the fact that prostitution had been carried on in the building prior to and on the eighth day of July. There was no testimony affirmatively showing that prostitution had not been practiced in the building after the eighth day of July. The showing on that question was of a negative character—that is to say, it consisted of statements of witnesses, who had not been about the premises after the eighth day of July, that they had no information that the illicit business had been prosecuted in the building after that date. So upon the question whether the building was used for the purposes of prostitution and assignation at all times down to the filing of the complaint, there was before the trial judge positive proof of circumstances from which the fact might justly be inferred, which proof was negatived only by testimony of a very indefinite, vague, and unsatisfactory nature. Hundreds, no doubt thousands, of witnesses could be produced who would testify that they had no knowledge, either from direct or indirect sources, of the existence or maintenance of immoral practices in the building either before or after the eighth day of July, 1917.

Two only of the several rulings as to the evidence complained of by the appellants were erroneous, but they were manifestly without prejudice to the rights of the appellants. The first of these was the ruling permitting the police officers to testify that the man they found in the Gray woman's room at the time of the raid had told them that he was there for the purpose of having sexual relations with the woman and had paid her for the service, without receiving the same. This testimony was plainly hearsay and inadmissible.

In this connection, we may, in view of the many cases arising and which will probably in the future arise under the Abatement Act, make these observations: That, while considerable latitude is allowed (and allowable) the people in the proof of a case arising under said act, there is no legal justification for a radical departure from the long-established rules of evidence to establish such a case. The act itself expressly provides that testimony of the general reputation of the place

against which the action is brought—a species of hearsay testimony, quite essential, it is true, in most cases under that act and in some otherwise arising—may be received. But, however laudable the purposes of the act may be, no more in a case instituted under the provisions thereof than in any other class of cases should the established rules of evidence be relaxed. Indeed, a trial court, it seems to us, should be specially careful in the trial of such a case, for under said act the personal property of the person charged with keeping a place prohibited thereby may be confiscated and sold, and the right of the owner of the premises against which the action is directed (the action being one *in rem* as well as *in personam*) to use the same for the period of one year may be foreclosed, thus depriving the owner of the income which may be derived from the property. Hence, while the people should not be unduly hampered in a proper effort to suppress the social evil which the act was designed to eradicate, and should be accorded in the trial full legal opportunity to do so, the rules of evidence long established and the wisdom and the efficacy of which for eliciting the truth in forensic controversies involving disputed questions of fact have been well confirmed by the test of long experience, should not be twisted or distorted or departed from merely for the achievement of some special end. These observations have no application to the present case, which, generally, appears to have been well and fairly tried, but are made merely with the view of emphasizing the important proposition that neither in a case under the Abatement Act, whose penalties are indeed severe, nor in a case under any other act, should a citizen's rights be so lightly treated or regarded as that he may be deprived of them by a failure to recognize and apply those substantial forms of procedural law which are intended to protect alike the rights of individuals and those of the public.

In the present case, however, the declarations of the man referred to could not have prejudiced the rights of the appellants, since there was other testimony (his presence in the room in a semi-nude condition with a known prostitute) which appears to have been sufficient conclusively to establish the immoral purpose for which he was in the room, a circumstance strongly supporting the charge that the place was being used for the purposes of prostitution. His explanation of the reason for which he was in the woman's room, therefore, was un-

necessary to be shown to prove the circumstance to which it related.

The second ruling was in allowing one of the police officers called as a witness for the people to testify that he had heard the testimony of the witness who had just preceded him on the stand and that "it was correct" or true in all particulars. Of course, such a method of corroborating a witness is not proper. A witness should be examined as to the facts of which he has knowledge, and so give the adversary party an opportunity to cross-examine him and thus test the accuracy of his knowledge of the facts to which he testifies and his memory, etc. But there was so much testimony to the same point that the method adopted was not prejudicial.

We have now examined and disposed of all the important points to which our attention has been directed by counsel. We may well add, however, that the decree itself is without prejudice to the appellants.

There was not made, as a part of the judgment, an order, which may be made under the provisions of section 7 of the Abatement Act, directing "the removal from the building or place of fixtures, musical instruments and movable property used in conducting, maintaining, aiding or abetting the nuisance, and directing the sale thereof," or an order directing the closing of the building or place against its use for any purpose and so keeping it closed for the period of one year, etc.

It will be observed that the decree goes no further than to perpetually enjoin the defendants from allowing the building in question to be used for the purposes of prostitution or lewdness of any kind or character. In other words, the effect of the decree is merely to prevent the defendants from using the building as a place for the commission of unlawful acts, or, expressing the proposition in another form of language, the effect of the decree is only to require the defendants to obey a legislative mandate, viz., not to use their property or permit it to be used for the purposes of prostitution or other like acts of immorality. It adjudges nothing as against the defendants which is not a duty, *per se*, resting upon all the people of the state—a duty which the defendants, trustees, unquestionably desire and intend, and have always desired and intended, to respect and at all times religiously adhere to. Very properly, since it is apparent that the appellants at no time had any actual knowledge of the existence and maintenance of the

nuisance complained of on their premises, the decree does not contain a provision or an adjudication that the appellants shall pay any of the costs of this proceeding. (*People* v. *Barbiere*, 33 Cal. App. 770, [166 Pac. 812].)   There is, therefore, imposed by the decree upon the appellants no penalty in the way of costs.

The claim that the effect of the decree is to cloud the title of the appellants to the property is clearly devoid of merit. It is as obvious as any proposition can be that a judgment the only effect of which is merely to enjoin the use of real property for unlawful purposes cannot operate to put a cloud upon the title to such property.   Such an adjudication might affect the reputation of the property upon which it directly acts and so cause the depreciation to some extent of the value of the property for renting or even selling purposes, but most certainly in no conceivable way can it have the effect of disparaging or affecting in the slightest way the title of the owners.

We have found no just reason for disturbing the decree, and it is accordingly affirmed.

Chipman, P. J., and Burnett, J., concurred.