[Civ. No. 2148.   Third Appellate District.—September 10, 1920.]

THE PEOPLE ex rel. BRADFORD, Respondent, v. VIN-
CENT LAMBERT ARCEGA, Appellant.

[1] RED-LIGHT ABATEMENT ACT—PLEADING—COMPLAINT.—In an action
under the Red-light Abatement Act, the mere statement in the
complaint that the premises in question were and had been used
for the purposes of lewdness, assignation and prostitution, is
sufficient, and the complaint need not contain a specific description
of the acts.

[2] ID.—MEANING OF WORDS OF ACT.—As used in the Red-light Abate
ment Act, the terms "lewdness," "prostitution" and "assignation"
bear a well-defined and well-understood meaning, and a complaint
charging in the general language of the act the nuisance at the
suppression of which the act is directly aimed must of necessity be
considered and construed to mean illicit sexual acts of conduct
amounting to or involving lewdness.

[3] ID.—EVIDENCE—NATURE OF.—A case founded upon the Red-light
Abatement Act may, like any other case or any other ultimate
fact, be established by circumstantial as well as direct evidence.

[4] ID.—ACTS OF LEWDNESS—SUFFICIENCY TO SUPPORT ABATEMENT.—
Under the Red-light Abatement Act, the nuisance upon which the
statute places its ban may consist alone of acts of lewdness.

[5] ID. — ACTS AND CONDUCT OF INMATES — COMPETENT EVIDENCE. —
In proving the nuisance denounced by the Red-light Abatement
Act, it is proper to show the acts, conduct, and words or language
of the inmates of the place or building against which the action
is instituted.

[6] ID.—CONVERSATIONS OF DETECTIVE WITH LANDLADY—ATTIRE OF IN-
MATES.—In an action to abate a nuisance under the Red-light
Abatement Act, testimony of a female detective as to her con-
versations with the "landlady" of the house in question, and as to
the manner in which the inmates were attired, was competent testi-
mony.

[7] ID.—TESTIMONY OF PEACE OFFICERS—CONSIDERATION BY COURTS.—
The rule to the effect that the testimony of detectives and police
officers or persons having a personal interest in the outcome of the
issue must be viewed with caution and that a judgment should not

1. Abatement of or injunction against bawdy-house as nuisance,
note, L. R. A. 1918D, 819.
3. Circumstantial evidence generally, notes, 62 Am. Dec. 179; 97
Am. St. Rep. 771.

be predicated alone on the testimony of such witnesses, has no application to reviewing courts, if, indeed, the rule is to be accepted under any circumstances under the present system of trials.

APPEAL from a judgment of the Superior Court of Sacramento County.   Chas. O. Busick, Judge.   Affirmed.

The facts are stated in the opinion of the court.

W. A. Gett for Appellant.

Hugh B. Bradford, District Attorney, for Respondent.

HART, J.—The action is prosecuted under what is known as the "Red-light Abatement Act" (Stats. 1913, p. 20).

The complaint alleges that the premises and building known as "No. 222 L Street," in the city of Sacramento, and described as the "East one-half of Lot No. three, in the block or square bounded by and between L and M and Second and Third Streets of said city of Sacramento," were, and for some time prior to the third day of January, 1918, "and ever since that date, and now are, used for the purposes of lewdness, assignation and prostitution, and upon said premises acts of lewdness, assignation and prostitution were held and did occur, and said premises were and now are a nuisance under the laws of the state of California." It is further alleged that the appellant, Arcega, is the owner of said property and premises, and that the respondents, George W. Locke & Son, a corporation, and certain fictitiously named parties, "have and claim some interest in and lien upon said real property, and that the respondents, George W. Locke & Son, Jane Coe and Susan Hoe et al. (fictitiously designated), are the owners of the furniture, fixtures, musical instruments and other movable property situated in said building, as the relator is informed and believes, and so alleges."

The prayer is for a decree perpetually enjoining said alleged nuisance, for the removal from said premises of the furniture, fixtures, etc., and the sale thereof in the manner provided by the Abatement Act and the closing of the premises and the building and the interdiction of their use for any purpose for the period of one year.

The findings were in accordance with the averments of the complaint and the decree follows the prayer of the complaint.

The appeal is by Arcega from the judgment.

[1]   The court below overruled a demurrer interposed by the appellant to the complaint and denied a motion likewise interposed to strike out certain specified portions of that pleading.  Both the demurrer and said motion raised the question whether the complaint stated a cause of action under the terms of the Abatement Act against the respondents in the court below.  The specific point thus made is that the mere statement in the complaint that the premises in question were and had been used for the purposes of lewdness, assignation, and prostitution involves a legal conclusion and that it is, therefore, deficient in the setting forth of a cause of action for the relief demanded, the position of the appellant being that, to state a case under the Abatement Act, the complaint must contain a specific description of the acts constituting all or any one of the alleged general acts of lewdness and prostitution and assignation.  This precise point has been repeatedly decided adversely to the position taken by the appellant.  (See *People* v. *Laine,* 41 Cal. App. 345, [182 Pac. 986]; *House* v. *Meyer,* 100 Cal. 592, [35 Pac. 308]; *Talbot* v. *Ginocchio,* 18 Cal. App. 391, [123 Pac. 223]; *Ellis* v. *Central Traction Co.,* 37 Cal. App. 390, 395, [174 Pac. 407]; *Doolittle* v. *McConnell,* 178 Cal. 697, 705, [174 Pac. 305].)

In the Laine case, which was an action under the Abatement Act, we expressly held that a general allegation that lewdness, prostitution, and assignation were habitually carried on and practiced on the premises or in the building complained of was sufficient.  And it may here be added that the present case is no different, so far as the complaint is concerned, from the following cases arising under the Abatement Act: *People* v. *Barbiere,* 33 Cal. App. 770, [166 Pac. 812]; *People* v. *Dillman,* 37 Cal. App. 415, [174 Pac. 951]; *In re Selowsky,* 38 Cal. App. 569, [177 Pac. 301]; *Chown* v. *Alexandre,* 35 Cal. App. 194, [169 Pac. 454].)

In *House* v. *Meyer, supra,* an action for damages resulting from the alleged negligence of the defendant, the complaint charged the negligence in general language, and the complaint on appeal was that a general allegation of negligence

was insufficient to state such a cause of action. The court held that such an allegation was all that was required to state a cause of action for the recovery of damages for injury produced by the defendant, and, quoting Bliss on Code Pleading, section 211, said: "The negligence is the ultimate fact to be pleaded, and is not a legal conclusion."

So, in the present case, the ultimate fact alleged is that the premises involved herein were, at the times mentioned in the complaint, used for the purposes either of lewdness, or prostitution or assignation, or for all those purposes.

[2] The argument that the words "lewdness," "prostitution," and "assignation" may be used in different connections or in different senses, according to the connection in which they are employed and are, therefore, ambiguous and indefinite as to their meaning or signification when used in a complaint prepared under the Abatement Act without specifically showing or alleging that they consisted of acts which the statute was designed to suppress, is, substantially, answered by what is above said, to which, however, may be added the suggestion that, as used in the Abatement Act, those terms bear a well-defined and well-understood meaning, and that a complaint charging in the general language of the act the nuisance at the suppression of which said act is directly aimed must of necessity be considered and construed and may readily be understood to mean precisely what those terms were obviously intended to signify when they were inserted in the statute, viz., illicit sexual acts or conduct amounting to or involving lewdness. The latter word, it may be further added, has but one meaning in whatsoever connection it may be used; and it is more comprehensive than either the word "prostitution" or the word "assignation" and may or may not include acts of prostitution and assignation.

The next point urged for a reversal is that the findings are not supported by the evidence. An examination of the evidence has readily convinced us that the point is not well taken. A brief reference to the testimony will confirm this conclusion.

It appears from the evidence that a party (a female) employed as a detective by the State Law Enforcement League, early in the evening of January 3, 1918, called at the house complained of here and asked to see the "landlady." The

witness was shown to the room of the "landlady," the latter then lying on a bed with a man having no clothing but his undergarments upon him, and the woman being clothed only with a kimono, which was "pulled up to her knees." The man was of large frame and appeared to the witness to be either a Greek or an Italian. The witness then proceeded: "The landlady asked me what my name was and who sent me. I told her my name was Maud Morris and that a lady had sent me over from 216½ L Street. I asked her if I could get work there. She said no, at the present time she did not need a girl, but she would take my name and address and would let me know. I said: 'You think you will have an opening very soon?' 'Well,' she said, 'I don't know.' The man on the bed said: 'Put that girl to work to-morrow.' So she said—the landlady said—'One of my girls will be sick to-morrow and she will be off for a few days, so you can come to work at 1 o'clock.' I asked her if the girls lived at this place and she said yes, they did, and for me to bring my things. She asked me where I lived and I told her, Hotel Trow. I asked her what price house it was. She said, '$1.50.' I asked her, out of that what did I have to give to the landlady, and she said fifty cents each per act of prostitution. I asked her how much the girls got for a man staying all night. She says, 'Ten dollars, or all you can get,' or, 'as much as you can get. Give me two dollars out of every ten—or,' she said, 'I get two dollars out of every ten.' I told her I would be back at 1 o'clock the next day. As I was going out I saw another girl in the hall, rouged and powdered up. Q. How many girls did you see in the place? A. Three girls, not including the landlady. Q. Three girls and the landlady? A. Yes." The witness further testified that the female who responded to the door alarm and admitted her (witness) into the house was heavily "rouged and powdered" and at the time wore a kimono or loose wrapper.

A police officer, connected as such with the police department of the city of Sacramento for many years, testified that the general reputation of the house in question was, at the time of the filing of the complaint, and had been for many years prior thereto, a place where sexual prostitution was habitually carried on.

That the above testimony abundantly supports the findings, there can be no manner of doubt. It is true that it is in its nature circumstantial, but the circumstances thus adduced before the trial court, it must be admitted, are of singular potency in probative force as in proof that the nuisance as charged in the complaint existed and was maintained in the building as described in the complaint. [3] Of course, it will not be denied that a case founded upon the Abatement ●Act may, like any other case or any other ultimate fact, be established by circumstantial as well as by direct evidence. [4] Even if prostitution or assignation was not thus sufficiently shown to have been practiced in the place, it is clear that lewdness was so shown, and obviously the nuisance upon which the statute places its ban may consist alone of acts of lewdness.

[5] It is lastly contended that the testimony of the statements made by the ''landlady'' of the house to the female detective was hearsay and, therefore, incompetent. The contention is meritless. In proving the nuisance denounced by the abatement act it is proper to show the acts, conduct, and words or language of the inmates of the place or building against which, as being conducted as such a nuisance, the action is instituted. As has often been declared in the cases, a building may become a nuisance under the act in question by being used for the purpose either of lewdness or of assignation or of prostitution, or by being used for the purposes of all those general acts. [6] The testimony of the female detective as to the conversations of the ''landlady'' and the manner in which she and other female inmates of the house were attired not only strongly tended to show that prostitution was habitually practiced therein, but quite clearly established the fact that acts or conduct amounting to lewdness within the purview of the statute were indulged in in said place.

[7] The rule cited by counsel and as declared by some of the cases and text-writers to the effect that the testimony of detectives and police officers or persons having a personal interest in the outcome of the issue before the court must be viewed with caution and that a judgment should not be predicated alone on the testimony of such witnesses, has no application to reviewing courts, if, indeed, the rule is to be accepted under any circumstances under our present system

of trials.  Under the old common law, a party to an action
or any party directly interested in the event of the trial
was not competent to testify in the action in his own behalf.
Such is not the rule under our system, however.  The rules
of evidence in this state are to be found in our Code of Civil
Procedure, and while they are based generally on the com-
mon-law rules, they, save perhaps in a very few instances,
measure and limit the power of our courts upon the question
of the admissibility or nonadmissibility and of the weight of
testimony.  We can conceive of no theory or sound reason
upon which it may be declared as an abstract proposition
that the testimony of a detective or a police officer or a per-
son directly interested in the outcome of a trial of an action
in the courts should be given less weight than that which
may be given to the testimony of any other witness.  There
is, in other words, no reason why the weight of the testi-
mony of such witnesses or the question of their credibility
should be prejudged by the trial court or the jury told by
the trial court that their testimony should be viewed with
caution or considered in a light different from that in which
the testimony of any other witness must be considered; and
there is nowhere in our codes any such rule laid down.  The
testimony of such witnesses must, therefore, be considered
and its evidentiary value measured by the jury or other trier
of facts by the same common tests as constitute the estab-
lished and accepted criterion by which the evidentiary value
of the testimony of all other witnesses is and, indeed, can
only be determined.  At all events, as before declared, the
rule sought to be invoked by counsel, if at all sound as a
rule to be put in actual practice, has application solely to
the trial of cases at *nisi prius* and not to the review of cases
on appeal.

Counsel, however, strangely suggest the novel and rather
remarkable proposition that the testimony of police officers
and detectives should be regarded as analogous to the tes-
timony of accomplices in criminal cases.  The proposition is
obviously absurd.  There is no analogy between the two
classes of witnesses referred to.  The rule as to accomplices
in crime is founded upon a rational theory, and is a wise
and just rule, the theory being that where an accomplice
testifies against one with whom he was jointly engaged in
the commission of a public crime the temptation to commit

perjury may be great, since there is always hope in the breast of the accomplice so testifying, even though not justified by any express promise by the representatives of the people, that he will be rewarded for his testimony by leniency in the matter of punishment in a degree commensurate with the strength or value of his testimony in favor of the people and against his companion in the crime charged, and thus he may be led to bear false witness against his confederate in crime. As above declared in a different form of language, this case does not present an instance to which the rule as to the testimony of accomplices in crime applies.

No legal or other reason has been shown for a disturbance of the judgment appealed from, and it is, therefore, affirmed.

Nicol, P. J., *pro tem.*, and Burnett, J., concurred.