[Civ. No. 17780.   Second Dist., Div. Two.   Dec. 22, 1950.]

NICHOLAS V. ODDO et al., Respondents, v. H. W. HEDDE et al., Appellants.

Kenneth Sperry for Appellants.

Roland G. Swaffield for Respondents.

MOORE, P. J.—Respondents sued for declaratory relief. Also they demanded cancellation of two notes and two trust deeds securing same, which they had executed in partial fulfillment of a contract they had executed with appellants. The notes were given as payment for labor and materials used in the construction of a building to be used by Dr. Oddo as a clinic. The basis for such demand was that at the time of executing the four instruments, appellants had no building contractor's license. Judgment was entered as demanded, except that in addition to the cancellation of the second trust deed and note for $6,530 respondents were awarded judgment against appellants for the sum of $11,220 as the amount which appellants had received for the first trust deed from the defendant bank which had purchased the paper in due course. Other terms of the judgment left respondents with the title of their property clear and with the completed building clear of debt. A reversal is demanded on the grounds that (1) the findings are without substantial evidentiary support; (2) errors in rulings on evidence; and (3) error in entering the money judgment.

Respondent Nicholas Oddo is a physician. He engaged Mr. Hedde to erect a building in Long Beach. On November 6, 1947, they executed a written agreement to effectuate that purpose, obligating Hedde to furnish all materials and labor. It was signed by only the doctor and the contractor. At the same time the physician executed one note for $17,750 and a trust deed securing same in favor of Hedde in which he was joined by Mrs. Oddo. Such note was for the full amount of the contract price and the trust deed conveyed the land on which the clinic was afterwards constructed. About 60 days later the second note for $6,530 and a second trust deed securing it on the same property were executed by Dr. Oddo and a credit for the latter sum was endorsed on the original note.

At the time of executing the ''Standard Form of Agreement Between Contractor and Owner'' and the first note and trust deed and during the course of constructing the building, Mr. Hedde held a ''Contractor's License . . . to engage in the business or act in the capacity of Contractor.'' But about the time the structure was completed respondents discovered that Mr. Hedde had not complied with a rule that had been adopted

earlier requiring contractors to be classified by the registrar. Such classification designated the holder of a General Engineering license—the kind held by Hedde—as of "A" classification and designated the general building contractor as of "SB-1" classification. Having ascertained that their contractor had not obtained a supplemental classification, respondents instituted this action to cancel all evidences of their debt to appellants.

The issue on this appeal is whether the court below was warranted in adjudging the invalidity of the instruments executed by respondents. For three reasons it was not.

### THERE WAS SUBSTANTIAL COMPLIANCE WITH THE LAW

In procuring the "General Contractor's License" in February, 1946, Mr. Hedde was evidently attempting to comply with sections 7028, 7030 and 7031,[1] Business and Professions Code. Section 7028 makes it unlawful for a person to act as a contractor without having a license therefor; section 7030 makes it a misdemeanor to do so; section 7031 requires a contractor to allege and prove that he was licensed in order to maintain an action to recover compensation for the performance of his contract. At that time Mr. Hedde had no knowledge of the registrar's rules. Indeed, they had not yet been adopted.

Knowledge of the rules classifying contractors first came to Mr. Hedde in the spring of 1948 by means of a bulletin mailed by the registrar to all licensees directing their attention for the first time to Rule 760.[2] It requires a general en-

---

[1] Section 7028: "It is unlawful for any person to engage in the business or act in the capacity of a contractor within this State without having a license therefor, unless such person is particularly exempted from the provisions of this chapter."

Section 7030: "Any person who acts in the capacity of a contractor without a license, and any person who conspires with another person to violate any of the provisions of this chapter, is guilty of a misdemeanor."

Section 7031: "No person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action in any court of this State for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging and proving that he was a duly licensed contractor at all times during the performance of such act or contract."

[2] Rule 760. (Effective July 17, 1947.)

"A licensee classified as a general engineering contractor, shall operate only within the scope as defined in Section 7056 of Chapter 9 of Division 3 of the Business and Professions Code.

"A licensee classified as a general building contractor, as defined in Section 7057, shall not take a prime contract unless the same

gineering contractor to "operate only within the scope as defined in section 7056, and that one so classified may not extend the scope of his operation to the fields defined by sections 7057 and 7058.[3] By his notice the registrar explained the meaning of the rule and advised that to avoid disciplinary proceedings it was necessary to obtain a supplemental classification; that if a contractor in one classification seeks to perform work of a type which falls under another classification he could not do so "unless such work is merely incidental to other work being done by him." Rule 760 had evidently been

requires more than two unrelated building trades or crafts, or unless he has qualified for the particular specialty classifications as established by the Board.

"A licensee classified as a specialty contractor, as defined in section 7058, shall not act in the capacity of a contractor in any classification other than the one in which he is classified. Nothing contained in this Rule shall prohibit the performance of work incidental or supplemental to the performance of a contract in a classification in which any contractor is licensed by the Board.

"Nothing in this rule shall be construed to extend the field and scope of the operations of a licensed contractor to those in which he is not classified and qualified to engage as defined in Sections 7055, 7056, 7057, and 7058. Failure on the part of a licensee to observe this rule shall constitute grounds for disciplinary action."

[3] Unless otherwise indicated, all sections cited are from the Business and Professions Code—to which the word "code" applies.

Section 7055: "For the purpose of classification, the contracting business includes any or all of the following branches:

(a) General engineering contracting.

(b) General building contracting.

(c) Specialty contracting.

Section 7056: "A general engineering contractor is a contractor whose principal contracting business is in connection with fixed works for any or all of the following divisions or subjects: Irrigation, drainage, water power, water supply, flood control, inland waterways, harbors, railroads, highways, tunnels, airports and airways, sewerage and bridges."

Section 7057: "A general building contractor is a contractor whose principal contracting business is in connection with any structure built, being built, or to be built, for the support, shelter and enclosure of persons, animals, chattels or movable property of any kind, requiring in its construction the use of more than two unrelated building trades or crafts, or to do or superintend the whole or any part thereof.

"This does not include anyone who merely furnishes materials or supplies under Section 7045 without fabricating them into, or consuming them in the performance of the work of the general building contractor."

Section 7058: "A specialty contractor is a contractor whose operations as such are the performance of construction work requiring special skill and whose principal contracting business involves the use of specialized building trades or crafts."

adopted in July, 1947, pursuant to section 7059[4] which was added by statutes of 1945, chapter 1159. That section provides that the "registrar with the approval of the board" is authorized to "adopt rules and regulations necessary to effect the classification of contractors in a manner consistent with established usage and procedure. as found in the construction business and may limit the field and scope of the operations of a licensed contractor to those in which he is classified and qualified to engage," as defined by the four preceding sections. Section 7055 divides the contracting business into general engineering, general building, and specialty. Section 7056 defines a general engineering contractor as one whose *principal* contracting business is in connnection with fixed works for irrigation, drainage, water power, etc. Section 7057 defines a general building contractor as one whose *principal* contracting business is in connection with any structure built for the shelter and enclosure of humans and animals, etc. "requiring in its construction the use of more than two unrelated building trades or crafts, or to do or superintend the whole or any part thereof."

Under rule 730 the Contractors State License Board declared its policy to be that all licensed contractors be classified, prescribing the scope and extent of each classification to be according to and consistent with the established usage and procedure and that those persons to whom have been issued valid licenses be classified into the classification in which the *majority of their contracting is embraced* and that they shall be given the opportunity to qualify for and be classified and licensed in other supplemental classifications in which they contract. By rule 731 it was provided that all persons li-

---

[4]Section 7059: "The registrar, with the approval of the board, may adopt rules and regulations necessary to effect the classification of contractors in a manner consistent with established usage and procedure as found in the construction business, and may limit the field and scope of the operations of a licensed contractor to those in which he is classified and qualified to engage, as defined by Sections 7055, 7056, 7057, and 7058. A licensee may make application for classification and be classified in more than one classification if the licensee meets the qualifications prescribed by the board for such additional classification or classifications. No additional application or license fee shall be charged for qualifying or classifying a licensee in additional classifications.

"Nothing contained in this section shall prohibit a specialty contractor from taking and executing a contract involving the use of two or more crafts or trades, if the performance of the work in the crafts or trades, other than in which he is licensed, is incidental and supplemental to the performance of work in the craft for which the specialty contractor is licensed."

censed under chapter 9, division 3 of the code (sections 7055 through 7059) shall be classified into one or more classifications or subclassifications.

On receipt of the published notice Mr. Hedde on February 3, 1948, requested that the supplemental classification of SB-1 be added to his general contractor's license. In March he took the examination following which the SB-1 supplemental classification was added to his "Contractor's License" on March 31, 1948. The examination consisted of one question, to wit, "compute the material required for the construction of a building ten feet square." By virtue of his liberal and technical education in three universities, his vast experience in various kinds of construction for the navy and other building and the freedom of his record from disciplinary proceeding, an SB-1 classification would have been issued to Mr. Hedde at any time in 1946 or 1947 at his request. There is not the slightest evidence of his disrespect or disregard for the statutes or rules governing the licensing of contractors, but on the contrary, it is shown that he was zealous to comply. In 1945 he applied for a "Contractor's License" for his firm. Such license was then given classification "A" which included "General Heavy Construction." In 1946 he applied for a license for himself with the same classification which was renewed in 1947 and 1948.

No admonition or suggestion appears on any of the blank forms provided for making the application except to return the filing fee with the application. At the times he filed his application in 1946 and for its renewal in 1947, if rules 730 and 731 and 760 had been adopted by the board, it was incumbent upon the registrar to advise licensees who might be affected thereby. In the modern state with all the regulations of man's activities, from the cradle to the grave, it is unthinkable that every individual of a group governed by an administrative board can have knowledge of every rule adopted for the regulation of members. The Contractors' State License Board recognized the futility of attempting to apply their rules before advising the trade of their adoption. This they did by publishing a notice of their new rules in a bulletin in February, 1948. That document discloses that the board had registered on December 31, 1947, 47,252 licensed contractors and notified them of the classifications and the letter designations thereof. If the board had entertained the theory that moves respondents herein they would have proceeded to administer the discipline prescribed for those who disobey

its rules. On the contrary rule 730 provided that licensees "shall be given the opportunity to qualify for and be classified and licensed in other supplemental classifications in which they intend to or do contract." Thus, if Mr. Hedde's "Contractor's License" was deficient when he made the contract with Dr. Oddo, by reason of his ignorance of the board's rules, he repaired his status by complying with the rules as soon as he had knowledge thereof. At that time the clinic had not been completed.

It was not the purpose of the Legislature in adopting the original "Contractor's License Law" in 1929 or in making additions or amendments thereto during the intervening years to work a hardship upon honest men engaged in a contracting business. ▆ The legislative intent was to protect the public against incompetent and dishonest operators. It could not have been reasonably intended that a person holding a general contractor's license must obtain the classification of a building contractor. Surely, it could not have been the purpose of the Legislature to forbid a contractor who has been duly licensed to recover payment for work done. If it had been, they would have said so. In 1929 they made it unlawful for a person to act in the capacity of a contractor without having a license. (Stats. 1929, ch. 791, p. 1591.) In enacting the code in 1939 they made the same provision in section 7030. Although sections 7056, 7057 and 7058 enacted first in 1937 provided for three classes of contractors, it continued to be "unlawful for any person to . . . act in the capacity of a contractor . . . without having a license therefor." (§ 7028.) Thus, Mr. Hedde was trained in the language of the statute to get a "contractor's license" before engaging in a contractor's business. It was reasonable and fair that inasmuch as he held a license to do general contracting business and had no actual knowledge of the registrar's rules at the time of contracting with Dr. Oddo, he was acting in substantial compliance with the law.

### Confusion in the Law

While section 7059 permits the registrar to adopt rules to effect the classification of contractors, such classification must be "in a manner consistent with established usage and procedure as found in the construction business." That section imposes no penalty upon a contractor. Neither does its language require one holding a general contractor's license to register under some other designation or to take out another

license. It does not forbid a general contractor to contract while awaiting the action of the board to classify contractors. The only inhibition against contracting without a license is found in section 7030 which makes it a misdemeanor. That section cannot affect Hedde for he held a license at the time of contracting and thereafter. The only provision of 7059 that pertained to his activities is that which permits the registrar to adopt rules. But they must be consistent with established usage and procedure of the construction business and they may ''limit the field and scope of the operations of a licensed contractor.'' However, the only penalty for ignoring a classification is to be ''subject to disciplinary action.''

To be ''disciplined'' by the registrar does not contemplate the divestment of the contractor from his total profits to say nothing of taking from him his total outlay in material and labor. Since the statute providing for classification is permissive and no penalty is prescribed for a violation of classification, it cannot be enlarged by the application of section 7030. Penal statutes that encroach upon private rights of citizens must be strictly construed, and statutes which provide for a forfeiture must be strictly construed. (*Johnson* v. *Kaeser,* 196 Cal. 686, 700 [239 P. 324] ; *Binford* v. *Boyd,* 178 Cal. 458, 462 [174 P. 56] ; *San Diego & A. R. Co.* v. *State Board of Equalization,* 165 Cal. 560, 567 [132 P. 1044] ; *People* v. *Zimbrolt,* 35 Cal.App.2d Supp. 745, 747 [91 P.2d 252] ; *People* v. *Moss,* 33 Cal.App.2d Supp. 763, 767 [87 P.2d 932].)

### The Judgment Is Inequitable

It would not be equitable to hold that a contractor who has substantially complied with all the statutory law enacted for his governance should be deprived of his capital and labor honestly invested in the construction of a building that is itself essentially a service to the state. To demonstrate the injustice of a decree that divests appellants of their compensation we need only consider the contemporaneous construction of the statutes prior to and during the year 1947.

When Mr. Hedde applied for his license he explained his qualifications and the type of construction he purposed to embrace within his activities. He stated that whereas he held a partnership license he ''wanted to take out an individual license . . . I told her I was doing all types of construction . . . both building and heavy construction . . . that I had an Engineering Degree . . . She told me that the Class A

license entitled me to do all types of construction work. . . . I took the blanks and . . . there was some additional material that I had to look up, and I put that on and then went back up and finished filling it out there . . . I filled out . . . the part that says 'type of work that you intend to engage in' . . . in the office up there.'' At the time he applied at the office of the Contractors' Board he conferred with Miss Smith, the ''senior stenographer clerk'' who had been there employed for nine years. Her duties included giving information about filling out applications for licenses. She was familiar with the policy of the office with respect to information which was given in 1945 and 1946 concerning the scope of the activities of a class A contractor and gave it on various occasions. The customary procedure was to give with every application a list of various classifications with their numbers. It was a general practice to tell applicants for class A licenses ''they could do anything at that time (1944-1945) under their licenses . . . it covered everything . . . that the 'A' was the highest classification, and when I first came into the Department, as I recall, that was the policy of the Board . . . [I was] instructed to inform applicants for licenses that the holder of a Class 'A' license was entitled to do any type of building construction.'' She was not positive as to the date of the change of information she gave to Class A applicants but it was brought about by some new rule. She testified, ''we send out a magazine periodically, and in this magazine which is supposed to be sent to all contractors, there was an article, something to the effect of the different classifications. I think that was in the first part of 1948 . . . that is when they were first notified. . . . We probably told them [contractors] they could do any class of construction work up to the time that magazine came out . . . February of 1948.''

Further proof of the contemporary construction of the statutes is found in the testimony of one Ralph Bowdle who instructed the clerks as to the procedure to be followed. He testified that he was there from 1930 to 1946 holding a series of positions from inspector to deputy registrar; that throughout that period a class A contractor was not required to obtain a B-1 supplemental classification ''in order to engage in General Building contracting work.'' Appellants offered to prove by Mr. Bowdle that from 1930 to 1946 general engineering contractors customarily performed building work of all kinds, including the erection of buildings for shelter of human beings, and that they still performed general building

work as a necessary, integral and important part of their construction business. The exclusion of such testimony was error. Where the good faith of a litigant is a part of his proof of an attempt to comply with a regulatory rule evidence that his conduct was in harmony with the prevailing practice in that respect is admissible. But Mr. Bowdle actually testified that under the prevailing policy of the board at the time Mr. Hedde filed his application for his contractor's license, in view of the applicant's experience as revealed by previous applications, a supplemental SB-1 classification would have been issued without further examination.

The construction of the statutes in harmony with appellants' theory and contention was not confined to the employees in the office of the licensing board. In May, 1944, the attorney general was asked, "may the holder of a general contractor's license accept a contract covering only one particular field of endeavor without first securing an additional supplemental classification in that particular field, such as painting and decorating, electrical work, etc." In his reply the chief law enforcement officer of the state replied, "if a person is licensed and classified as a general contractor, he can take a contract for construction business for any type of construction work. . . . The holder of a general contractor's license may accept a contract covering only one particular field of endeavor, and he need not secure an additional supplemental specialty classification . . . .and he may do the entire work himself." (Opinions of Attorney General, vol. 3, p. 311.)

In view of the contemporaneous construction given the Contractors' License Law by the registrar, the board and the attorney general, no limitation had been prescribed against the permissive scope of the activities of the Class A licensee by the Legislature. That contemporaneous construction of a statute by the administrative agencies must be given effect in determining the meaning and legislative intent is the law of this state. (*In re Parker's Adoption*, 31 Cal.2d 608, 615 [191 P.2d 420]; *Mudd* v. *McColgan*, 30 Cal.2d 463, 469 [183 P.2d 10]; *Whitcomb Hotel, Inc.* v. *California Employment Commission*, 24 Cal.2d 753, 757 [151 P.2d 233, 155 A.L.R. 405].) If Hedde was licensed to engage generally in the contracting business under his Class A license which entitled him to engage in all types of construction without obtaining a supplemental classification, for what reason should his contract with

respondents be annulled? If he was "qualified to engage in the whole," said the attorney general, "he is necessarily qualified to engage in any part thereof." If other evidence were required to establish Mr. Hedde's substantial compliance with statutes and rules involved and his right to be paid for his labor and investment, it is to be found in his application for his license. In attempting to prepare that document in consonance with the regulations, he answered the query as to the type of contracting business in which he purposed to engage. He wrote, *"general building and heavy construction."* With that disclosure before his eyes it was the imperative duty of the registrar to issue to him a license to build houses. Since the failure to grant him a license of the proper classification was due to the mistake of the registrar's office, it was dishonorable for respondents to refuse payment on that account and it would be grossly oppressive for this court to affirm a judgment upholding such refusal. Where statutes have been enacted for the purpose of protecting society against dishonest and unequipped persons in the contracting business and they have not been scorned by an honest and educationally qualified contractor who has in good faith dealt with the state and with his client, it would be inequitable and unjust solely on the ground that he has violated such law to deprive him of a substantial investment in the performance of a contract and, on the assumption that he has violated the law to make a gift of his wealth to another. Especially is this true where at the time of applying for his license such contractor disclosed his true intentions to the registrar and relied upon him to issue the appropriate license. To do so would be to convert a statute designed for a shield into a machine gun for the destruction of men of integrity and good faith who are the builders of the state.

While no case parallels the factual situation here presented there are some decisions that indicate a more amiable attitude toward justice than the judgment herein. In *Norwood* v. *Judd,* 93 Cal.App.2d 276 [209 P.2d 24], the judgment had denied the plaintiff recovery from defendant of any of the profits earned from their partnership contracting business by reason of the fact that the partnership held no contractor's license. About the time they formed the partnership Judd applied for and obtained a contractor's license in his own name. The license was changed nine months later to Fred T. Judd Company, but the application failed to disclose the company was a partnership. The board was never informed

of Norwood's interest in the business. When he left it was agreed Judd would try to dispose of the enterprise, settle its affairs and divide the assets on the basis specified. The law-suit followed Judd's refusal to account to Norwood. On the trial for a dissolution and accounting it was found that the type of work performed by the partnership required a license "in the name of the copartnership"; that both licenses had been issued to Judd individually; and that none was issued to the copartnership. Such finding was the basis of the judgment that their business was illegal and consequently "plaintiff is not entitled to an accounting or to any division of the profits." After pointing out that "this is not a case where the parties engaged in a business prohibited by statute or public policy, or where a license would not have been issued had application been made" the court holds that there are exceptions to the contractor's license law which forbids recovery by an unlicensed contractor. While the situation of Mr. Hedde is not that of one partner suing another, the doctrine announced by the court there applies with equal propriety, namely, "equity can and will grant relief where the court is not required, in granting relief, to lend its aid in enforcing a transaction illegal only because a permit that could have been secured was not secured." *Gatti* v. *Highland Park Builders,* 27 Cal.2d 687 [166 P.2d 265], is more nearly in point. The defense was that the plaintiff partnership held no license. After Gatti had contracted for the work he formed the partnership whereupon defendant consented that the partnership might complete the contract, but the latter entity did not obtain a license. Nevertheless, recovery was allowed. The law was passed for the protection of the public and should not be used as a "shield for the avoidance of a just obligation." If an honest partnership may prevail without a license, so also may an honest individual contractor. The statute applies with equal force to both.

If Mr. Hedde's conduct be not a substantial compliance with the act, his conduct furnishes an exception to the general rule. Not only did he hold a license to "act in the capacity of contractor within the State of California," but he had obtained the same license for his partnership in April, 1945. In the latter application he wrote that he intended to "engage in all types of heavy building construction"; in his 1946 application he wrote that he intended to engage in "General Building and Heavy Construction." He was qualified by virtue of his technical training and his university degrees as

well as by his years of practical experience to receive a Supplemental B-1 classification, could have procured it in 1946 by his mere request and at any time thereafter on application and examination. He did not ask for it in 1946 because he had no actual knowledge of the rules that had been enacted pursuant to section 7059 necessitating the Supplemental B-1 license for builders and the registrar did not suggest that he do so. No doubt the latter thought, as his aides understood, and the attorney general had opined, that if a contractor is qualified to engage in the whole, he is necessarily qualified to do any part. No limitation was contained in the general license upon the extent to which Mr. Hedde might contract. Clearly, the position of appellants is a thunderous appeal to equity. The chancellor should denounce with resentment the effort of a litigant who would build his fortune by the addition of the wealth of others to whom he is in debt.

### RULE 760 WAS NOT VIOLATED

The rule provides that the registrar may not extend the ''field and scope'' of the operations of a licensed contractor to those areas in which he is not classified. But section 7056 defines a general engineering contractor as one whose ''principal contracting business'' is in connection with ''fixed works.'' From the mere fact that his *principal* business is with fixed works, it must have been the intention of the Legislature that he will do some contracting within a ''field and scope'' outside of fixed works, perhaps build a house now and then. In the instant action respondents failed to establish that the principal contracting business of Mr. Hedde was such as to violate the rule. The rule-making power of an administrative officer or board arises only from the statute that authorizes it and a rule which conflicts with it is void. The registrar made no attempt to limit the ''permissible scope of a general engineering contractor'' prior to July, 1947. The latter had been permitted to engage in all kinds of construction business, as indicated by the cited opinion of the attorney general. If rule 760 should be interpreted to mean that a general engineering contractor may no longer engage in any kind of construction business outside of ''fixed works'' without an opportunity to qualify, then the rule would be void as being in excess of the scope of sections 7056 and 7059. (*Blatz Brewing Co.* v. *Collins,* 69 Cal.App.2d 639, 645 [160 P.2d 37]; *Campbell* v. *Galeno Chemical Co.,* 281 U.S. 599 [50 S.Ct. 412, 74 L.Ed. 1063, 1069].)

■ But rule 760 was not designed to impose penalties and forfeitures upon contractors. In view of the language of the resolution (rule 730) declaring the policy of the board and of the subsequent rules they appear to have been conceived for the purpose of enabling the registrar better to manage and regulate the professions of engineers, builders and contractors. Rules 732 to 754.8 name all the classes of contractors and define the types of work included. Rule 755 permits a licensee to be licensed in more than one classification. Rule 756 requires the applicant to give a statement of the general nature and type of contracting in which he intends to engage and the *primary* classification in which he would be classified. Rule 758 provides for a change of, or supplemental, classification after a written examination and 759 authorizes the registrar to waive the written examination upon a conclusive showing of sufficient experience for a supplemental classification. Neither the Legislature nor the registrar has provided and, indeed, neither could do so, a penalty for breaching such rules, but rule 794 says merely that a violation thereof "shall constitute grounds for disciplinary action." Such action is taken upon a verified complaint (§ 7090) and the proceedings are conducted in accordance with the Government Code (§§ 1150 to 11528) which provides for judicial review. But section 7095 makes provision for the decision to permit "the licensee to complete any or all contracts shown . . . to be uncompleted" while section 7100 provides that the court may upon his filing a bond, permit the licensee to continue as a contractor pending entry of judgment.

In the enactment of such statutes providing for a contractor to continue with his contracts while under fire, could the legislative intent have been that he should work and buy more materials and complete his contract and not recover their value? ■ Certainly, if a contractor steps over the line from his principal classification his only punishment can lawfully include no more than might be meted out by a court upon a review of the order of the registrar. Therefore the court below exceeded its jurisdiction in attempting to enforce a forfeiture of all the investment of appellants by reason of Mr. Hedde's not having a builder's SB-1 classification.

## MRS. HEDDE AS A PARTY

There is no significance to the fact that Mrs. Hedde was a copayee with her husband on the notes and trust deeds or in the fact of her joining in the notice of completion. The issue

as to Mr. Hedde's classification as a builder does not involve Mrs. Hedde. If the contract were void she would suffer no more detriment than the loss of the moneys payable under the notes. Since the notes are valid she shall receive payment as therein provided.

Judgment reversed with instructions to enter judgment for the defendants.

McComb, J., and Wilson, J., concurred.

A petition for a rehearing was denied January 10, 1951, and respondents' petition for a hearing by the Supreme Court was denied February 19, 1951. Edmonds, J., Carter, J., and Schauer, J., voted for a hearing.