[No. 2087.   Decided March 26, 1896.]

Elizabeth Pugh *et al., Respondents,* v. Oregon Improvement Company *et al., Appellants.*

PLEADING — INCONSISTENT DEFENSES — NEGLIGENCE—FIRE IN MINE —
CONTRIBUTORY NEGLIGENCE.

In an action to recover damages for death resulting from the alleged negligence of defendant, an answer denying negligence, and setting up further, that, if there was any, the plaintiff's intestate was guilty of contributory negligence, is not objectionable as setting up inconsistent defenses.

Although the stopping of a ventilating fan, upon the discovery of a fire in a coal mine, may have been an act of negligence on the part of the mining company, yet there can be no recovery for the death of a miner resulting therefrom, when it appears that he had ample warning of the fire, in time to have escaped from the mine; but that he remained to watch it, and that escape was finally prevented by the act of a fellow miner in opening a tunnel door, thereby allowing the smoke to pour into a passageway, which was apparently safe, and suffocate the deceased.

Appeal from Superior Court, King County. — Hon. Richard Osborn, Judge. Reversed.

*Andrew F. Burleigh,* and *S. H. Piles,* for appellants.
*Thompson, Edsen & Humphries,* for respondents.

The opinion of the court was delivered by

Scott, J.—This action was brought to recover damages for the death of John T. Pugh, which occurred in an accident at the Franklin mine, owned by the Oregon Improvement Company, on the 24th of August, 1894, by which accident Pugh and thirty-six other miners lost their lives. It is alleged that the defendants negligently allowed a fire to break out in the mine and afterwards negligently shut off the ventilation, whereby the deceased was suffocated. A verdict

and judgment were rendered for the plaintiffs in the sum of $4,000.00, whereupon this appeal was taken upon two grounds:   The first being that there was no evidence of negligence upon the part of the defendants; and the second, that, if there was, the deceased was guilty of contributory negligence.   Preliminary to a consideration of the facts, a contention of the plaintiffs that these defenses were so inconsistent that they cannot both stand, and that the plea of contributory negligence was a confession of negligence upon the part of the defendants, will be disposed of with the statement that this court has lately taken occasion to examine the question of inconsistent defenses at length in the case of *Seattle National Bank v. Carter*, 13 Wash. 281 (43 Pac. 331); see, also, *Corbitt v. Harrington, ante*, p. 197; and, under the conclusion we there arrived at, the defendants had a right to deny the matters upon which the claim of negligence was based or that the same constituted negligence, and also plead further, in case the contrary should be established, that the deceased was chargeable with contributory negligence.   There is no element of bad faith in such defenses certainly as applied to the facts of this case, and they were both permissible.

   There was nothing to show any negligence upon the part of the defendants, so far as the origin of the fire was concerned, nor did the plaintiffs rely much upon such a claim.   Their main contention was based upon the alleged negligence of stopping the fan used for ventilating the mine.   Said mine consists of seven levels, varying from 300 to 350 feet apart.   The main slope, starting from the top, reaches down six levels, and another shaft connects the sixth and seventh levels.   The mine, at the time, was provided with four separate shafts; the main slope, by which cars

were raised and lowered and men could ascend and descend; the air course, at the top of which the fan was located, which was also provided with steps for ingress and egress; the easterly slópe, or Green River slope, as it is sometimes called, the mouth of which is near Green River, and the pipe tunnel, also near the Green River slope, by which steam was taken from the boilers at Green River and the pump lines were carried, making four separate means by which escape could be had from the mine.

On the 24th of August coal was being mined from the fifth, six and seventh levels, nearly all of the work being done on the sixth level and north from the main slope. This part of the workings was called the sixth level north, or sixth north. There had been a fire on the fifth level near the main slope, and heavy partitions of masonry had been put across completely cutting it off from the main slope, while back beyond the fire other partitions had been erected, thus enclosing the fire between masonry walls, while still back beyond on the fifth level a connection had been made with the sixth level, by means of which coal was mined on the fifth level and put down through chutes to the sixth level. This portion of the mine was ventilated by means of the fan at the top of the air course. The fan was of the variety known as suction, and drew the air up through the air course, the current going down the main slope, then, being deflected off on the sixth level along the gangway, went as far as the gangway was driven, then it was turned up into the rooms where the men were working, down to the return air course entirely through the sixth level, up into the fifth level, down to the sixth level again to the return air course, and then out of the air course by way of the fan, which was situated on a hill about 350 feet above the

entrance to the main slope. As the air in the mine is of nearly constant temperature and the atmosphere outside varies, if the fan were not running, the current of air through the mine would vary according as the temperature outside was hotter or colder than the air in the mine. In case the air in the mine was the warmest, the column of air in the air course being 350 feet higher than the cold air coming down the slope, would raise of its own accord and the current of air would be down the main slope, through the workings and out through the air course. If, on the other hand, the temperature outside was much higher than that in the mine, the air current would reverse and would go down the air course, around through the workings and out at the main slope. At the time of the accident the outside air was much warmer than that in the mine.

The main slope, as well as the air course, are not driven in the coal vein. On account of the danger from fire, and for other reasons, they are in a vein about 153 feet from the coal vein in what is known as the dirt vein. Both the dirt vein and the coal vein were inclined at an angle of from 30 to 45 degrees. At the foot of the air course a connection was made with the sixth level by driving a tunnel from the dirt vein to the coal vein through the 153 feet of intervening strata, consisting mostly of rock, and this tunnel was known as the rock tunnel; and a door was constructed where it joined the coal vein which was known as the rock tunnel door. The method of mining the coal is as follows: A gangway about eight feet high and eight feet wide is driven along on the coal vein, with a gradual ascent from the main slope to permit the drainage of water. After the gangway is driven back a suitable distance from the main slope,

rooms are driven off from it at a distance of about 50 feet from centre to centre. The rooms are 30 feet wide in the clear, leaving a partition of 20 feet of solid coal between each room. Said rooms are not driven 30 feet wide clear to the vein, but the entrance to them is left about 8 feet wide, through which a manway is made for the convenience of the men, and a partition constructed in the chute connecting the room with the gangway, so that although the chute is filled with coal which has been loosened and started down ready to be loaded in the cars, the men can still ascend and descend through the manway and take timber and other supplies up. The crosscut and return air course is a passage way about 6 feet wide and 6 or 8 feet high, placed back 30 feet from the gangway or sixth level, and parallel with it. A narrow chute connects the room with the gangway. The 6th level, at the time of the fire, was driven north beyond breast 87, breasts on the sixth level being numbered north from the foot of the old slope, and as the breasts were 50 feet between centres, the men farthest north on the sixth level were not to exceed 1,200 feet north of chute 62, where the fire was first discovered.

Between 11:20 a. m. and 11:25 on said 24th of August, the fire was discovered in this chute about halfway between the gangway and the cross-cut. It appears that said chute was dry and free from slack or debris, and it is claimed that it was impossible for the fire to have originated by spontaneous combustion. It is not known how it did originate. One of the boys engaged in driving mules and hauling coal along the gangway first discovered it, and immediately notified John Schneider thereof. Schneider thereupon instructed this boy and three or four other boys working

there to notify the miners to come out of the mine, that it was on fire.

Pugh was then working in breast 82, with one Israel Stevens, on the north sixth level, 1,000 feet from where the fire occurred. The distance from chute 62 to breast 49, where the rock tunnel door is located, is 650 feet, and from there to the foot of the main slope 1,700 feet. Pugh and Stevens were notified of the fire and ordered to come out between 11:25 and 11:30. It would have taken them between five and six minutes to travel from breast 82 to a point south of the rock tunnel door, which was a place of perfect safety, and about seven or eight minutes to travel from the rock tunnel door to the foot of the main slope, where there would have been no possible danger. But Pugh, instead of going out and saving his life as his partner, Stevens, did, remained with a large number of other men. There is a good deal of testimony to show that they stopped near the fire, watching it, and there is no question but that nearly all of those lost stopped at that point after starting to leave the mine, and remained there for some considerable time before heeding the alarm given and endeavoring to get out of the mine or to a place of absolute safety. It is one of the disputed facts in the case, however, as to whether Pugh stopped there or elsewhere, but we do not regard it as very material, for the undisputed facts show that he had ample time to have gotten out.

After Schneider was informed of the fire he went as far north as breast 75 and assisted the boys in notifying the miners of it and to leave the mine. He then returned to the fire and went out at the foot of the main slope, a distance of 1,700 feet, then returned to the fire and afterwards made his escape in safety.

One of the causes contributing to the death of the miners was the opening of the rock tunnel door. The air passed down the main slope by this door and along to the extreme end of the gangway. Said door is at the foot of the air course, known as the fan shaft, in which is constructed a manway or exit from the mine, and is for the purpose of preventing the air from taking a short cut through said air course and so as to compel it to pass on along the gangway to the north end thereof, then back through the cross-cut and through the various rooms or breasts where work is being done. It does not appear that Pugh, or any of the men remaining at the fire, made any effort to notify any one on top that they intended to stay there instead of coming out, nor did they give any notice to the officers or men on top as to the location of the fire. About 11:25 James Cave, an outside watchman at the mine, discovered smoke oozing out of the fan-house. He concluded that the persons operating the fan had failed to oil the boxes and that the smoke was produced by overheated machinery. He slowed the fan down, but did not stop it, and examined the boxes, but ascertained that they were in good order. It is claimed that he then left in quest of Ramsey, the assistant superintendent, and went to the engine house to look for him, but as Ramsey was then on his way home to lunch he did not find him, but saw one George W. Smalley, who went to the mouth of the slope and telephoned down to ascertain the location of the fire. Smalley and Cave thereupon went to the fan-house. Smalley was also of the opinion that the boxes were overheated, and he again slowed the fan down but did not stop it, and he ascertained that the machinery was in good order. This slowing down of the fan by Cave and Smalley accounts for the sluggish condition of the air

22—14 WASH.

testified to by some of the men who first left the mine.
The fan, after being slowed down by Cave and Smalley,
was immediately started up at full speed.    About this
time smoke began to pour out of the fan-house in a
great volume and while it was so pouring out, and
about 12:05, it is contended by the defendants that a
young man by the name of Grantilla, one of the trip
riders at the mine, and who came from the direction
of the mine, came running up to the fan-house and
called out, "The whole north sixth is on fire.    Shut
down the fan," and that the men at the fan-house, un-
der the impulse of the moment and assuming that this
notice and request came from the miners, and being
placed in a position where they saw the urgent need
of acting without loss of time, shut down the fan,
thinking it the right thing to do under the circum-
stances.    If the defendants are right in this conten-
tion as to how the fan came to be shut down there was
no evidence of negligence against them whatever upon
which a recovery could be had, the act having been
done by fellow-servants of the deceased.    But it is
contended by the plaintiffs that the fan was shut down
by order of Ramsey, the assistant superintendent, and
there being some testimony to sustain this contention,
although it seems to us the great weight was to the
contrary, we are bound to leave the question to the
province of the jury for determination; and to assume
that they did determine it in favor of the plaintiffs,
and hereon rests their case as to the negligence of the
defendants, for the opening of the rock tunnel door
was by a fellow-servant.    Shutting down the fan would
have resulted in no injury to the men in the mine had
they not opened this door, as the smoke, passing down
the fan shaft by reason of the reversal of the air,
would have passed north through the cross-cut and

thence down into the north end of the north sixth level, passing south along the north sixth level to the men remaining at the fire, and thereby have driven them out of the mine.

Prior to the shutting down of the fan it appears that the men standing around the fire, and who had been standing there for possibly half an hour, began to call out to open the rock tunnel door. In response to this call, John Johns, one of the gas testers in the mine, went to said door, a distance of about 700 feet from the fire, and opened it. While Johns was opening the door, the men again called out, " open the rock tunnel door," and in response to this call Schneider also started to open it and he met Johns returning therefrom, and upon informing him that he was going to open the door Johns stated that he had already opened it. Schneider and Johns remained for a moment or two conversing, when they discovered smoke oozing out of the brattice or partition constructed at chute 54. Johns then stated to Schneider that he thought he had made a mistake in opening the rock tunnel door, and for him to go and close it. Schneider thereupon undertook to close it, and when opposite it and in an endeavor to close it, he ran into a bank of smoke which extinguished his light and made it impossible for him to find or close the door. Schneider then made his way out until he saw a dim light ahead of him to the south, when, being overcome by the smoke, he fell down and cried for help. John Morgan, who was gas tester on the seventh level, and who was traveling in the direction of the fire, heard Schneider's cries and rushed to his rescue. He got Schneider on his feet and sent him on top to notify them to start the fan, which was done and was there-

after kept running. It seems that Schneider was the last man to escape from the mine.

Taking it as an established fact that the operation of the fan was stopped by Ramsey, the assistant superintendent, and that this would sustain the charge of negligence against the defendants, we think that the proofs show that the deceased was clearly guilty of gross contributory negligence. The men inside could not certainly know that the men outside knew at what point in the mine the fire was located. If the fire had been located at a point south of the rock tunnel door, the only possible means of escape for the men who unnecessarily loitered at the fire would have been up through the rock tunnel door and the manway in the air course or fan shaft above described, as there were no exits north of the rock tunnel door. This the men at the fan, the miners and everyone else working at the mine well knew. With the fire located south of the rock tunnel door, the shutting down of the fan would have reversed the air current, and instead of permitting the smoke to go north, would have driven it south towards the foot of the main slope and thereby permitted the men to escape out through the fan shaft, while its continuous operation, had the fire been located south of the rock tunnel door, would have meant certain death, in that it would have drawn the flames and smoke in upon the men and shut off the only exit from the mine.

It is established beyond any doubt that the company wanted the men to come out of the mine and notified them to leave it. It likewise appears that they had ample time to get out. A number of miners who were working farther north in the mine than the deceased made their escape without any difficulty. But Pugh did not heed the warning given and chose

to remain.   He voluntarily assumed whatever risk
was connected therewith, and the plaintiffs should be
held as bound thereby.   It is contended that there
was nothing to cause alarm in the fire itself and that
there should have been no danger therefrom.   But
that this cannot be true seems to us a self-evident
proposition.   First, from the fact that they were
bound to know that the men outside might not know
the location of the fire and as to whether or not the
fan should be or could be safely stopped depended
upon its location.   Secondly, they must also have
known that the large volume of smoke issuing from
the mine out through the fan-house would greatly ex-
cite the men there, and that it was not safe to depend
upon them to do the right thing under the circum-
stances, even if they knew the location of the fire.
Their very situation was a warning in itself to leave.
They were 900 feet beneath the surface of the earth
with a fire raging near them which could not have
been otherwise than a source of danger.   They even
failed to take any precautions for their safety by as
much as notifying the men at the top to keep the fan
going.   It is contended by the plaintiffs that, although
Pugh saw fit to remain in the mine, his remaining
there was not a direct or proximate cause of the re-
result.   But it seems to us clearly otherwise.   He had
no right to depend upon the company's agents or
laborers outside or inside to do just what should be
done under such exciting circumstances, when he must
have known that a mistake might be fatal to him, but
should have left the mine or at least have gone to a
place of unquestioned safety.   If he had done so in
obedience to the notice, as his fellow workman Stevens
did, his life would have been saved.   He did not do

so and thereby directly contributed to the result. Even though the fan was stopped by direction of Ramsey and this would warrant a charge of negligence against the defendants we are still of the opinion that the motion for a non-suit should have been granted.

Reversed.

HOYT, C. J., and ANDERS, GORDON and DUNBAR, JJ., concur.

## ON PETITION FOR RE-HEARING.

SCOTT, J.—A petition for a re-hearing has been filed herein, calling attention to the fact that the opinion mentions some matters which did not appear until after the motion for a non-suit was made. These related mainly to a description of the premises and to circumstances connected with the opening of the rock tunnel door. None of said matters influenced the finding of the court from the plaintiffs' case, that Pugh was guilty of contributory negligence. He was an able-bodied man in full possession of his faculties. It is certain that he was notified to leave and that he started to leave the mine with Stevens. Stevens kept on and got out without difficulty. He passed a dozen or more men who were loitering at the fire. It did not appear clearly whether Pugh stopped there or elsewhere, but that was immaterial. Two other men made their escape after Stevens made his. The court was then and is now of the opinion that the plaintiffs' testimony showed that Pugh had ample time within which to have left the mine, and that in not leaving he assumed the risk connected therewith, and the defendants were entitled to a non-suit, conceding that the charge of negligence against them had been established.

ANDERS and GORDON, JJ., concur.