[L.A. No. 31520. Jan. 31, 1983.]

THE PEOPLE ex rel. JOHN K. VAN DE KAMP, as District Attorney, etc., Plaintiff and Respondent, v.
AMERICAN ART ENTERPRISES, INC., et al., Defendants and Appellants.

COUNSEL

Brown, Weston & Sarno, David M. Brown, G. Randall Garrou and Robert A. DePiano for Defendants and Appellants.

John K. Van de Kamp and Robert H. Philibosian, District Attorneys, Harry B. Sondheim and Dirk L. Hudson, Deputy District Attorneys, for Plaintiff and Respondent.

## OPINION

**KAUS, J.**—This case presents a narrow question of statutory interpretation: do the current provisions of the Red Light Abatement Law (Pen. Code, §§ 11225-11235)[1]—the act—authorize an award of damages against an owner of property that has been used for purposes prohibited by the act? Because such damages are not included among the sanctions specifically enumerated in the act, and because past authorities establish that the primary purpose of the act is to "reform" the property in question rather than to punish the property owner, we conclude that the act does not authorize such a damage award.

### I

Defendants own a building on Lassen Street in Chatsworth, California, which was used as the headquarters of their business of publishing and distributing sexually explicit matter conceded not to be obscene. On August 22, 1972, the People filed this action, alleging that the premises were being used for the purpose of "lewdness, assignation and prostitution," and therefore constituted a nuisance under the act. (§ 11225.)[2] Pursuant to the relevant remedial statutory provisions of the act, the complaint sought a permanent injunction against the prohibited activity, as well as an order closing the premises for one year and directing the sale of all furniture, fixtures and movable property used to carry out the nuisance. (§ 11230.)[3]

---

[1]Unless otherwise indicated, all section references are to the Penal Code.

[2]Section 11225 provides: "Every building or place used for the purpose of illegal gambling as defined by state law or local ordinance, lewdness, assignation, or prostitution, and every building or place in or upon which acts of illegal gambling as defined by state law or local ordinance, lewdness, assignation, or prostitution, are held or occur, is a nuisance which shall be enjoined, abated and prevented, whether it is a public or private nuisance.

"Nothing in this section shall be construed to apply the definition of a nuisance to a private residence where illegal gambling is conducted on an intermittent basis and without the purpose of producing profit for the owner or occupier of the premises."

[3]Section 11230 provides: "If the existence of a nuisance is established in an action as provided in this article, an order of abatement shall be entered as a part of the judgment in the case, directing the removal from the building or place of all fixtures, musical instruments and movable property used in conducting, maintaining, aiding or abetting the nuisance, and directing the sale thereof in the manner provided for the sale of chattels under execution, and the effectual closing of the building or place against its use for any purpose, and that it be kept closed for a period of one year, unless sooner released. While such order remains in effect as to closing, such building or place is and shall remain in the custody of the court. For removing and selling the movable property, the officer is entitled to charge and receive the same fees as he would for levying upon and selling like property on execution. For closing the premises and keeping them closed, a reasonable sum shall be allowed by the court."

On the basis of evidence which showed that defendants had used the premises to arrange for and direct the photographing of explicit sexual acts engaged in by paid models for purposes of publication, the trial court found that the Lassen Street building was a "nerve center" for prostitution. Nevertheless, because none of the photographed sexual acts took place at the Lassen Street premises, the court held that the building was not "used for the purpose of . . . prostitution" within the meaning of the act and denied relief.

On the first appeal in this case—the one now before us is the second—the Court of Appeal reversed the judgment, concluding that the trial court's findings established as a matter of law that the Lassen Street building was in fact a "building . . . used for the purpose of prostitution." (*People* ex rel. *Van de Kamp* v. *American Art Enterprises, Inc.* (1977) 75 Cal.App.3d 523, 529 [142 Cal.Rptr. 338].) Nevertheless, since the People had conceded that the publishing business did not involve obscenity, the Court of Appeal recognized that application of the full sanctions authorized by the act would clash with settled constitutional free speech principles. It explained: "Because the publishing activity conducted at the Lassen Street building constitutes virtually the sole purpose for which the building is used and it is conceded that obscenity is not involved, closure of the building and removal of property from it is an unconstitutional prior restraint upon protected speech and press itself. [Citations.]" (*Id.,* at p. 531.)

Nonetheless the Court of Appeal concluded that some sanctions authorized by the act short of closure or removal of nonobscene publications—for example, an injunction barring use of the premises to arrange acts of prostitution—could be imposed consistent with applicable constitutional guarantees. Accordingly, the Court of Appeal remanded the case to the trial court to fashion constitutionally appropriate relief.[4]

On remand the trial court found that intervening events had relieved it of the duty to perform the delicate surgery demanded by the Court of Appeal: the nuisance had been voluntarily abated in that defendants had moved their business activities elsewhere. Further, in July 1976 they had leased the building to an unrelated electronics firm for a five-year term with two 5-year renewal options. Concluding that the injunctive relief suggested by the Court of Appeal in the first appeal was not appropriate under the circumstances, the court imposed a damage award of $168,000—the value of one year's rent of the building—against defendants because of "past acts" and the "possibility of

---

[4]Under the law of the case doctrine, the Court of Appeal's decision in the first appeal establishes—for purposes of this proceeding—that some of the activities at the Lassen Street premises violated the act. (See, e.g., *People* v. *Shuey* (1975) 13 Cal.3d 835, 840-842 [120 Cal.Rptr. 83, 533 P.2d 211].) Accordingly, that issue is not before us at this time.

future violations."[5] The court's memorandum of decision indicates that it reasoned that it was within its discretion "to award general damages in lieu of injunction" and that the statutory authorization for a one-year closure made the one-year rent figure an appropriate monetary sanction.[6]

On this appeal defendants contend that the damage award is not authorized by the statute.

## II

The Red Light Abatement Law declares that every building used for the purpose of prostitution "is a nuisance which *shall be enjoined, abated and prevented . . . .*" (Italics added.) (§ 11225.) Section 11226 authorizes the district attorney to bring an action to abate, prevent and perpetually enjoin such nuisances. In addition, section 11230 provides, as an additional remedy, for the removal and sale of all fixtures and movable property on the premises used in aiding or abetting the nuisance and for the closure of the building for up to one year. Section 11231, in turn, provides that if property is removed and sold pursuant to section 11230, the proceeds of the sale shall be applied to (1) the fees and costs of the removal and sale, (2) the expenses involved in "closing and keeping closed the building," and (3) the payment of plaintiff's costs in the action. The balance of the proceeds are to be paid to the owner of the property.[7]

---

[5]In its memorandum of decision the trial court wrote that "[t]he prospect of future violations at Lassen Street in view of the continued activities elsewhere is not sufficiently foreclosed by the execution of a five-year lease. Therefore, the need for relief can properly be based both on defendant's past acts, and the possibility of future violations on the premises." The court then cited *United States* v. *W. T. Grant Co.* (1953) 345 U.S. 629 [97 L.Ed. 1303, 73 S.Ct. 894], a Clayton Act case in which the defendants had ceased the offensive conduct—interlocking directorates—and the Supreme Court upheld the district court's refusal to enjoin a repetition, although it recognized its power to so enjoin the defendants. In this case we are, of course, not concerned with any asserted power to enjoin future acts of prostitution at Lassen Street after the termination of the lease. In any event, the formal findings which followed the memorandum of decision did not repeat the quoted language, but merely recited that "[t]here is a need for relief based on past acts and on the possibility of future violations."

[6]We must take issue with the dissent's statement that "the monetary sanction in this case was . . . 'an act of grace toward the defendants, . . .'" (Dis. opn., *post,* pp. 343-344) The established facts are that "the publishing activity conducted at the Lassen Street building *constitutes virtually the sole purpose for which the building is used . . .*" (italics added) (75 Cal.App.3d at p. 531). Consequently virtually all the activities at the address were protected by the First Amendment. This obviously left little room for the abatable activity, yet the monetary sanction imposed was one year's rent for the entire building, hardly the sensitive approach which was enjoined by the first appeal and certainly not—by any standard—an "act of grace."

[7]Section 11231 provides: "The proceeds of the sale of the property, as provided in Section 11230, shall be applied as follows: [¶] 1. To the fees and costs of removal and sale; [¶] 2. To the allowances and costs of closing and keeping closed the building or place; [¶] 3. To the payment of plaintiff's costs in the action; [¶] 4. The balance, if any, shall be paid to the owner of the property so sold. [¶] If the proceeds of the sale do not fully discharge all such costs, fees and allowances, the building and place shall also be sold under execution issued upon the order of the court or judge and the proceeds of such sale applied in like manner."

None of the provisions of the act, however, purports to authorize the imposition of a fine or monetary damage award as an alternative to abatement, closure of the premises or removal and sale of property.

■ ■■■ In this case the trial court obviously felt that injunctive relief was no longer warranted in light of the lease of the Lassen Street building.[8] Nevertheless, the court was understandably dissatisfied with a resolution which permitted the culpable owners of the building to escape any sanction. Thus, it devised a monetary fine—equivalent to one year's rent—as a substitute for the statutorily authorized one year's closure.

■ As we have seen, however, the act does not authorize a monetary fine or damage award. Although the statute does authorize a variety of sanctions to cover the costs of closing the property and the costs of prosecution, those remedies are explicitly in rem—the statute only permits these sums to be satisfied from the sale of property.[9] This is consistent with the primary object of an abatement action—to "reform" the property and insure that the nuisance is abated, not to punish for past acts. (See, e.g., *People* ex rel. *Sorenson* v. *Randolph* (1979) 99 Cal.App.3d 183, 188-189 [160 Cal.Rptr. 69]; *People* ex rel. *Hicks* v. *Sarong Gals* (1974) 42 Cal.App.3d 556, 563 [117 Cal.Rptr. 24].)[10] To read the statute as authorizing a damage award or penalty to be levied directly against the property owner would be to ignore the clear words of the statute and the apparent intent of the Legislature.[11]

The People assert that a monetary award is appropriate because "presumably the nuisance continues at another location." As the Court of Appeal explained

---

[8]Although section 11230 is worded in mandatory terms, it has long been interpreted as affording the court discretion not to close the premises if the court finds closure inappropriate under the particular circumstances of the case. (See, e.g., *Selowsky* v. *Superior Court* (1919) 180 Cal. 404, 412-413 [181 P. 652].)

[9]The dissent contends that the statute is both in rem and in personam. However, the only portion of the statute authorizing an in personam remedy is contained in section 11226, which authorizes the state or an individual to "maintain an action in equity to abate or prevent the nuisance and to perpetually enjoin the person conducting or maintaining it . . . ." The fact that an in rem remedy punishes the owner of the affected property, does not turn it into an in personam sanction.

[10]In this regard, past Red Light Abatement Law cases have held that when a nuisance has been voluntarily abated in good faith before a complaint is filed, the action should be dismissed. (See, e.g., *People* v. *Goddard* (1920) 47 Cal.App. 730, 740 [191 P. 1012]; *People* v. *Burch* (1920) 46 Cal.App. 391, 395 [189 P. 716]; *People* v. *Dillman* (1918) 37 Cal.App. 415, 419 [174 P. 951].)

[11]In similar fashion, although California's general nuisance statute expressly permits the recovery of damages in a public nuisance action brought by a specially injured party, it does not grant a damage remedy in actions brought on behalf of the People to abate a public nuisance. (See Code Civ. Proc., § 731.) In the absence of explicit statutory authorization, the Court of Appeal has held that an award of such damages is improper. (*People* ex rel. *Gow* v. *Mitchell Brothers' Santa Ana Theater* (1981) 114 Cal.App.3d 923, 931-932 [171 Cal.Rptr. 85].)

in *People* v. *Burch, supra,* 46 Cal.App. 391, 394, however, "[A]n action under the 'Red-light Abatement Act' is not one for the abatement of prostitution . . . but one for the abatement of a public nuisance committed or maintained by the habitual practicing *in a building or in or on any premises* of acts of prostitution . . . ." (Italics added.) The statute authorizes a court to act with respect to particular property, not to impose sanctions for the prohibited activities in general.

Of course, if defendants use another location for the purpose of committing a nuisance within the meaning of the act, the People may bring a new action to abate it at that location. In any such action, section 11227 authorizes a trial court to issue a temporary injunction to abate the nuisance if its existence is shown "either by verified complaint or affidavit." Under the current provisions of the act, however, the damage award imposed in this case was improper.

The dissenting opinion, while acknowledging that there is nothing in the statute which explicitly authorizes the $168,000 "penalty" (dis. opn., *post,* p. 339), argues that we should uphold the award as a proper exercise of the trial court's general equitable power. ■ However, it is well settled that " '[c]ourts will not impose penalties for noncompliance with statutory provisions in addition to those that are provided expressly or by necessary implication.' " (*General Motors Accept. Corp.* v. *Kyle* (1960) 54 Cal.2d 101, 111 [4 Cal.Rptr. 496, 351 P.2d 768]; *City Lincoln-Mercury Co.* v. *Lindsey* (1959) 52 Cal.2d 267, 276 [339 P.2d 851]; *Grant* v. *Weatherholt* (1954) 123 Cal.App.2d 34, 43 [266 P.2d 185]; see also *People* ex rel. *Mosk* v. *Barenfeld* (1962) 203 Cal.App.2d 166, 177 [21 Cal.Rptr. 501]; *Oddo* v. *Hedde* (1950) 101 Cal. App.2d 375, 383 [225 P.2d 929]; *County of Alameda* v. *Freitas* (1935) 8 Cal. App.2d 653, 654-655 [48 P.2d 165]; *Fresno Loan & Thrift* v. *Roberts* (1962) 207 Cal.App.2d Supp. 899, 902 [25 Cal.Rptr. 624].) Indeed, in *People* v. *Superior Court (Jayhill)* (1973) 9 Cal.3d 283 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191]—the case relied on by the dissent to support such an exercise of equitable power—we specifically *rejected* a similar contention; in that case we held that while a trial court could order *restitution* to defrauded customers of door-to-door encyclopedia salesmen in the exercise of its equitable power *to restore the status quo,* a court could *not* appropriately award "exemplary damages"—which the *Jayhill* court referred to as "the equivalent of a civil penalty"—in the absence of explicit statutory authorization. (9 Cal.3d at p. 287.)

The judgment is reversed.

Bird, C. J., Mosk, J., Richardson, J., and Broussard, J., concurred.

**REYNOSO, J.**—I dissent.

Although a monetary sanction is not specifically authorized by the Red Light Abatement Law (Pen. Code, § 11225 et seq.; hereafter the act), in my judgment imposition of such a sanction—in lieu of closure or injunction—was well within the equitable power of the court under the circumstances of this case. That the sanction appears to be in personam, rather than purely in rem, in no way leads to a contrary conclusion.

*The Circumstances of This Case*

We deal with a case in which the Court of Appeal had ruled as a matter of law that the activities taking place in the building in question were covered by the act. (*People* ex rel. *Van de Kamp* v. *American Art Enterprises, Inc.* (1977) 75 Cal.App.3d 523, 529 [142 Cal.Rptr. 338] (*American Art I*).) Although the trial court had determined that the premises were a prostitution "nerve center" (*id.*, at p. 527), it concluded that the building—which was used for publishing, distributing and storing pornographic materials—was not used for the purpose of prostitution within the meaning of the act. The Court of Appeal reversed. Describing the premises as "the headquarters of various entities constituting a corporate empire engaged in the publication and distribution of pornographic materials" (*id.*, at p. 527), the Court of Appeal held that photographing paid models while engaged in various sexual activities constituted prostitution, and that, therefore, the premises were subject to the provisions of the act though the acts of prostitution were arranged to be consummated elsewhere (*id.*, at p. 529). The unlawful activities—procurement of illicit sexual encounters involving minors and adults—are detailed in *American Art I* and *People* v. *Fixler* (1976) 56 Cal.App.3d 321 [128 Cal.Rptr. 363] (criminal prosecution of employees-photographers of American Art Enterprises).

The Court of Appeal remanded with directions to consider injunctive relief, if appropriate "depending upon findings of fact" (*American Art I, supra,* at p. 531), to assure that further acts of prostitution did not recur. It declined to reinstate a previously dissolved preliminary injunction (*id.*, at p. 532), having earlier observed that the trial court is "vested with broad discretion to fashion an appropriate remedy" for abatement (*id.*, at p. 529). However, closure of the building and removal of the property were excluded as possible sanctions. There was danger of prior restraint upon protected speech and press because, according to the opinion, " . . . the publishing activity conducted at the . . . building constitutes virtually the sole purpose for which the building is used and it is conceded that obscenity is not involved, . . ." (*Id.*, at p. 531.)

The changed circumstances on remand—the lease of the building to a third party for legitimate purposes—presented the trial court with a considerable

dilemma. Yet, the court was able to fashion a creative and equitable remedy. In my view, the trial court applied the law to the facts of the case at bench in an eminently reasonable manner.

I stress that the Court of Appeal had held that the act could be enforced. Thus, that was not a fact issue; defendants were in violation of the act as a matter of law. The trial court could have tailored, as directed, a limited injunction consistent with First Amendment principles, but the illegal activity was no longer taking place on the premises. Moreover, the Court of Appeal's protective ruling had no applicability to the changed circumstances since the fact that the premises were no longer being used for publishing eliminated any possible conflict with the First Amendment. The trial court could have found that closure was appropriate but for the fact that the building had been leased to an innocent tenant.

The court was therefore compelled to conclude that neither closure nor injunction was appropriate—the former because the closure would hurt an innocent third party, and the latter because the nuisance had been abated on the premises. What should the court do? The trial court's response was measured; it decided to impose a sanction of $168,000, the rental value of the building for one year. Such an order is in the best tradition of the exercise of equitable power: it protected the innocent third party, but at the same time did not permit the property owner to escape sanctions by leasing the same property which the court could have closed, or against which it could have issued an injunction.[1]

The majority's reversal, however, has deprived the People of a remedy, though it cannot be disputed (and the majority concedes) that defendants' activities were violative of the act. Thus, these culpable defendants—the losing party after 10 years of litigation—escape sanctions completely. The majority reaches this result by reasoning that the closure and sale remedies "are explicitly in rem" and that the object of an abatement action is "to 'reform' the property . . . not to punish for past acts." (*Ante,* at p. 333.) Great reliance is placed on the fact that the statute does not specifically authorize a monetary sanction. (*Ibid.*)

Admittedly, the issue before us is a troublesome one; however, I can find no adequate basis in logic, authority or traditional principles of equity for a rule

---

[1]Though the trial court's monetary award may have been imposed for the purpose of deterring a recurrence of defendants' illicit activities, I recognize that there is nothing in the record before us which establishes conclusively that defendants have simply taken their business elsewhere (though that in fact may be the case). I therefore agree that the sanction cannot be upheld based on what the court itself characterized as "the possibility of future violations." However, as I discuss, *infra,* the trial court properly concluded "[t]here is a need for relief based on past acts. . . ." In the court's own words: "The value of one year's rent is the proper remedy, considering the equities of the parties and the rights of the present tenants."

which permits a sophisticated, fast-footed defendant to escape liability. It is evident that, under the facts of this case, the policy purposes of the act have not been effectively realized. As I shall explain, after first briefly discussing the principal purposes of the act, in my judgment the provisions of the act can be reasonably construed to provide for remedies which are both in personam and punitive in nature. I would not, however, perpetuate the confusion in the case law caused by the unnecessary and formalistic use of the terms "in rem" and "in personam" in the context of abatement proceedings.

*The Act*

Since its enactment in 1913, the Red Light Abatement Law has had as its principal purpose—as its name suggests—the abatement "of houses of ill fame . . . and other like places, where acts of lewdness and prostitution are habitually practiced and carried on as a business." (*People* v. *Barbiere* (1917) 33 Cal.App. 770, 775 [166 P. 812].) The abatement of nuisances is a long established and well recognized exercise of the state's police power. (*Ibid.; People* ex rel. *Hicks* v. *Sarong Gals* (1974) 42 Cal.App.3d 556, 563 [117 Cal.Rptr. 24].)

The courts have recognized the multifaceted nature of the act. The statute has been variously described as "civil in nature" (*Board of Supervisors* v. *Simpson* (1951) 36 Cal.2d 671, 672 [227 P.2d 14]), as "penal in nature" (*id.,* at p. 674), and as "authorizing the interposition of equity" (*Barbiere, supra,* 33 Cal. App. at p. 776). It is clearly all three. More accurately, the act is penal in nature, and thus "in aid of and auxiliary to the enforcement of the criminal law" (*Simpson, supra,* at p. 674); but a case brought under the act invokes the jurisdiction of the civil courts which, at least theoretically, are designed to provide summary disposition and flexible equitable remedies. (See *People* v. *Arcega* (1920) 49 Cal.App. 239 [193 P. 264].)

I respectfully suggest that the majority fails to fully appreciate the penal nature of the act: the statute is part of the Penal Code; the act of maintaining the nuisance is itself a crime (Pen. Code, §§ 315, 316)—i.e., nuisance per se; and the district attorney is charged with the duty of bringing proceedings under the act in the name of the people of the state (Pen. Code, § 11226). Although it is a maxim that equity will not enjoin the commission of a crime (Civ. Code, § 3369; *Perrin* v. *Mountain View Mausoleum Assn.* (1929) 206 Cal. 669 [275 P. 787]), public nuisance actions are an exception to the rule, by statute and at common law. (Civ. Code, §§ 3369, 3491; *Johnson* v. *V. D. Reduction Co.* (1917) 175 Cal. 63 [164 P. 1119].) In my judgment, the penal nature of the act and the historical evolution of the public nuisance doctrine suggest that the trial court's monetary sanction was proper.

At common law, a *private* nuisance consisted of a nontrespassory invasion of plaintiff's right to the use and enjoyment of *his* land. (See generally, Comment, *The Revival of Criminal Equity* (1903) 16 Harv.L.Rev. 389.) Courts, however, "not only began freely to enjoin injuries to public property, but even extended the jurisdiction so as to include public nuisances caused by indecent or disorderly conduct." (*Id.*, at p. 396; see also Prosser, *Private Action for Public Nuisance* (1966) 52 Va.L.Rev. 997.) Under our state's current law, a private person has no remedy against a public nuisance[2] "unless he is injuriously affected; in other words, unless, it is a *private* nuisance also as to him." (7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 104, p. 5324 (original italics), and cases cited *id.* at § 104; see also Civ. Code, § 3493.) A private person, however, may seek abatement *and* damages, while a public attorney bringing an action to abate a public nuisance under Code of Civil Procedure section 731 is entitled only to injunctive relief. (*People* ex rel. *Gow* v. *Mitchell Brothers' Santa Ana Theater* (1981) 114 Cal.App.3d 923, 930 [171 Cal.Rptr. 85].) This is so not only because section 731 fails to specifically authorize a damage award in favor of public attorneys, but also—and more importantly—because a public attorney bringing an action on behalf of a community is unable to show an actionable interference with specific property, i.e., there is no compensable injury.

The first sentence of section 731 allows the recovery of damages by "any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, . . ." By contrast, the second sentence of the statute, applicable to public attorneys, makes no mention of damages or specific injury to property. Although the *Mitchell Brothers'* court disallowed damages *in addition* to injunctive relief, I think its holding also precludes an award of damages *in lieu* of injunction. I therefore conclude that a "damage" award in addition to, or in lieu of an injunction is improper in any public nuisance action by a public attorney, whether under the act or section 731 of the Code of Civil Procedure. (Cf. Civ. Code, § 3484.) However, while the damage remedy set forth in section 731 clearly contemplates *compensatory* relief, the penal counterpart—the act—provides for the additional *punitive* remedies of closure and sale of property. As noted by the *Mitchell Brothers'* court in rejecting the city attorney's contention that closure was authorized by section 731, injunctive relief is the sole remedy that the statute authorizes a public attorney to seek. (114 Cal.App.3d at p. 931.) Thus, the court in *Mitchell Brothers'* did not have occasion to decide whether a monetary award or sanction is proper in lieu of closure. In the present case, we are concerned with an entirely different statutory scheme which, as noted earlier, is both civil and penal in nature. I would view the monetary sanction imposed on defendants not as a "damage" award, but as just that: a sanc-

---

[2]Civil Code section 3480 provides: "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

tion, a civil penalty in the context of a penal statute. Unlike the majority, I think the closure and sale remedies of the act are not solely in rem as these sanctions clearly prescribe in personam punishment as to the owner of the property.

*In Personam and Punitive Nature of Remedies*

The provisions of the act prescribe "certain specific forms of relief not available under the general nuisance statutes, including temporary injunctions, removal and sale of fixtures, and closure of the premises for one year." (*People* ex rel. *Busch* v. *Projection Room Theater* (1976) 17 Cal.3d 42, 60 [130 Cal.Rptr. 328, 550 P.2d 600], citing Pen. Code, §§ 11227, 11230.) Precedent establishes the in personam and punitive aspects of these remedies.

In discussing the act, *People* v. *Barbiere, supra,* 33 Cal.App. 770, 778, declared: "The action authorized by the statute is *in rem,* or against the property used in the maintenance of the nuisance, as well as *in personam,* or against the person maintaining it." (See also *People* v. *Dillman* (1918) 37 Cal.App. 415, 421 [174 P. 951].) This view more realistically recognizes the in personam consequences which the abatement remedy has on the property owner; those of deterrence *and* punishment. An examination of the prescribed remedies reveals that *Barbiere's* characterization of the act is accurate—i.e., injunctive relief is essentially in personam; conversely, the closure and sale remedies are primarily in rem, though, as will appear, their effect is unquestionably punitive.

Injunctive relief need not detain us long. By definition, injunctions are directed at persons—the person is enjoined from committing certain acts. The majority concedes that the injunctive relief authorized in section 11226 of the act constitutes an in personam remedy. (*Ante,* at p. 333, fn. 9.) The majority opinion, however, focuses on the admittedly in rem nature of the closure remedy. I am not persuaded though that the closure and sale remedies are purely in rem. Nor does the authority upon which the majority has grounded its holding support the view that the sole object of these remedies is to "reform" the property. Although the cases relied upon by the majority do state that the purpose of the act is to reform the premises (*People* ex rel. *Sorenson* v. *Randolph* (1979) 99 Cal.App.3d 183 [160 Cal.Rptr. 69]; *People* ex rel. *Hicks* v. *Sarong Gals, supra,* 42 Cal.App.3d 556), these cases merely reiterate the in rem aspect of the closure and sale remedies for the purpose of explicating holdings not here relevant.

*Sarong Gals* and *Randolph* described the closure and sale remedies as in rem—though the term is not specifically used—for the purpose of rejecting constitutional challenges. In upholding a closure sanction, the court in *Sarong Gals* noted that proceedings under the act are directed against property; thus, it held

that "while appellants are arguably denied their right of First Amendment expression to some extent, they are denied such right only upon the specific property here involved and only for a limited period of time." (42 Cal.App.3d at p. 563.) *Randolph,* another appeal from an order of closure, cited *Sarong Gals* for the proposition that "the purpose of the proceedings is the reformation of the property. . . ," (99 Cal.App.3d at p. 188); the court then held that there is no right to a jury trial in such proceedings (*id.,* at p. 189). Because there is already authority for the rule that there is no right to a jury trial (see, e.g., *People* v. *Peterson* (1920) 45 Cal.App. 457, 461-462 [187 P. 1079]; *People* v. *Barbiere, supra,* 33 Cal.App. 770, 778), the *Randolph* court did not need to ground its holding on the presumed in rem nature of the remedies. (*Barbiere*—which, as noted, did not characterize the act purely in rem—held that there is no right to jury trial because the act invokes the equity jurisdiction of the courts.)

I am not persuaded by these authorities that the remedies provided in sections 11230 and 11231 of the act can be properly characterized as purely in rem. Moreover, these cases do not hold, as suggested by the majority, that the sole object of the act is to reform the property and "not to punish for past acts." (*Ante,* at p. 333.) In fact, the very cases relied upon by the majority (*Randolph* and *Sarong Gals*) upheld closures *after* the nuisance had been abated. Why impose a sanction when the property has already been "reformed?" It seems evident that the closure and sale remedies of the act are to a large degree punitive. Even though the closure-sale sanction is directed primarily at property, it cannot be reasonably disputed that it also has in personam consequences, i.e., it penalizes the owner by depriving him of the use of real property and subjecting him to the loss of personal property. Closure may be fairly characterized as an extreme form of injunction: it enjoins the owner and occupant from using or occupying the premises for any purpose for one year. Such a "reformation" of the property is both in rem and in personam.

Case law acknowledges the penal and in personam nature of the closure and sale sanctions. As this court noted in *Board of Supervisors* v. *Simpson, supra,* 36 Cal.2d 671, 674: "Proceedings under the [act] are somewhat in the nature of actions to recover *penalties* or forfeitures, for thereunder the fixtures and paraphernalia in the place abated are partially forfeited and the place may be closed to use for any purpose for a year. [Citation.] *It is penal in nature.*" (Italics added.) Similarly, the Court of Appeal has declared that "under [the] act the personal property of the person . . . may be confiscated and sold, and the right of the owner of the premises against which the action is directed (the action being one *in rem* as well as *in personam*) to use the same for the period of one year may be foreclosed, *thus depriving the owner of the income which may be derived from the property.*" (*People* v. *Dillman, supra,* 37 Cal.App. at p. 421; italics added.) As the majority notes, the proceeds from the sale of the

owner's personal property are applied to the costs of the removal and sale, the cost of keeping the building closed, *and* the People's costs of litigation. (Pen. Code, § 11231.) Further, if the proceeds are insufficient to discharge these costs, the act provides for a most severe sanction to make up the deficiency—sale of the building itself. (*Ibid.*) Though the closure-sale sanction has been described as confiscatory (see, e.g., *People* v. *Burch* (1920) 46 Cal.App. 391, 401 [189 P. 716]), its constitutionality has nonetheless been upheld (*People* ex rel. *Hicks* v. *Sarong Gals, supra,* 42 Cal.App.3d 556, 563).

The harsh and confiscatory provisions of section 11231 would appear to be strong evidence of a legislative intent that the court should not consider itself limited only to abating the nuisance. I suggest that the intent of the Legislature was twofold: that the court use its equitable power (1) to ensure complete abatement of the nuisance by ordering closure of the building, and (2) to provide an additional deterrent by imposing penalties on the owner for engaging, or (if the nuisance has been abated) for having engaged in acts which, in addition to being indictable offenses, constitute a public nuisance. In this way the People are insured proper redress. Thus, while I agree with the majority that the primary object of the closure remedy is reformation of the property, I emphasize that this remedy inevitably also penalizes the owner (in personam). Because the court can order closure and sale even if the nuisance has been abated,[3] these additional sanctions are fairly clearly punitive. In this regard the People point out that "a year's closure for all purposes is in the nature of a forfeiture (of the use, rents, profits, . . .) and that it is no accident that the Act is found, not in the Civil Code (as are public nuisance laws), but the Penal Code." Similarly, a distinguished commentator has observed, referring inter alia to the act, that "[a] proceeding to forfeit property used in illegal activity, pursuant to a statute authorizing such a step, is *civil* in nature, but *quasi-criminal* in effect." (2 Witkin, Cal. Procedure, Actions § 18, at p. 896, original italics; see also *Simpson, supra,* 36 Cal.2d 671, 674.) As the foregoing demonstrates, the "penalties" of sale and closure (*Simpson, supra*), the "deprivation" of income (*Dillman, supra,* 37 Cal.App. 415), and the imposition of various "costs" (§ 11231) are more in the nature of "punishment" of the owner rather than "reformation" of the property.

---

[3]Courts have consistently rejected contentions that an order of closure is invalid where there has been an alleged voluntary abatement. (See, e.g., *People* ex rel. *Hicks* v. *Sarong Gals, supra,* 42 Cal.App.3d 556, 561; *People* v. *McGonigle,* (1942) 56 Cal.App.2d 17, 20 [132 P.2d 7]; but compare *People* v. *Goddard* (1920) 47 Cal.App. 730, 734 [191 P. 1012] [premises vacated three days before complaint filed].) The majority cites *Goddard* for the general rule that dismissal is proper "when a nuisance has been voluntarily abated in good faith before a complaint is filed, . . ." (*Ante,* at p. 333, fn. 10.) This rule of course has no application to the present case where the nuisance was abated, by leasing the premises, at the time the case was before the Court of Appeal in *American Art I.* Prior to that, the nuisance was abated by order of the trial court which had issued, on the day after the complaint was filed, a temporary restraining order which, in turn, was subsequently superseded by a preliminary injunction.

In the present case, the court could have ordered the premises closed though the nuisance had been abated by execution of the lease—which I emphasize occurred *after* the complaint was filed (see fn. 3, *ante*)—but it did not, because to do so would have penalized the innocent tenant, not the owner. Thus, defendants really have no ground for complaint since the premises could have been closed, their personal property sold, and costs imposed against them. "[T]he result was really more favorable to [defendants] than [they] had the right to expect." (*People* v. *Gifford* (1921) 54 Cal.App. 182, 184 [201 P. 469].) The monetary sanction imposed by the trial court—the only remedy possible under the circumstances of this case—would have required defendants to forego a year's profits derived from the offending premises and would have allowed the People to recover their costs (which are probably not insignificant after 10 years of litigation).[4] This result would have been obtained had the closure and sale remedy been used; a fortiori, the monetary sanction is consistent with the purposes of the act.

In sum, I have used this section to emphasize that the remedies—more accurately, "sanctions," as the majority seemingly concedes—provided by the act are both in personam and in rem in nature. I would not, however, employ either term to characterize the act. Such refinements are not only formalistic but unnecessary.[5] I respectfully point out that by characterizing the closure and sale remedies as purely in rem, the majority makes the property itself the nuisance. (See fn. 5, *ante*.) While it has been held in other contexts that the primary purpose of the act is to reform the property in question, the act permits a court to impose sanctions which in essence penalize the owner. That the Legislature intended to provide punitive sanctions, which are harsh but within judicially established limitations, is understandable in view of the hybrid nature of the

[4]In addition to seeking a permanent injunction, closure of the premises and sale of personal property, the People requested "such other costs as the court shall deem proper" and "such other and further relief, as to this court may seem fit and just."

[5]Such distinctions are inconsistent with an action which is historically rooted in penal and equitable principles. Although the act uses the term "building," the property is not in itself a nuisance. (Compare *Knapp* v. *Newport Beach* (1960) 186 Cal.App.2d 669 [9 Cal.Rptr. 90] [dilapidated apartment building a public nuisance].) The act defines as a nuisance "[e]very building or place *used for the purpose* of . . . prostitution. . . ." which in itself is a crime. Thus, the act's remedies are directed not only at "reforming" the building but also, more precisely, at stopping the activity which makes the building a nuisance. The act seeks to deter and punish, as I explain *infra,* the use and maintenance of the building for the proscribed purposes. It cannot properly be characterized as purely in rem despite seemingly contradictory language in *People* v. *Gifford, supra,* 54 Cal.App. 182, 183.

By contrast, a public nuisance action under Code of Civil Procedure section 731 has been described in *People* v. *Mitchell Brothers' Santa Ana Theater, supra,* 114 Cal.App.3d 923, as essentially in personam—against an act not property—though this term is not specifically used. "[T]he public nuisance is not the theater . . . it is the *exhibition* of . . . obscene films . . . that constitutes a public nuisance." (At pp. 931-932, original italics.) Yet, an injunction under section 731 or closure under the act would enjoin a defendant from doing a proscribed act; i.e., showing a film or using a building to arrange prostitution. I find no logical reason or purpose to label one in rem and the other in personam.

act—penal, civil, and equitable. Manifestly, the act punishes as well as reforms.

Having concluded that the act permits a court to penalize the owner, the question remains whether it can impose a sanction not specifically authorized by the act. As will appear, I think the answer is, "Yes!"

*Equitable Power to Impose Monetary Sanction*

The Legislature has exercised its police power through enactment of the act which is equitable in nature. (*People* ex rel. *Sorenson* v. *Randolph, supra,* 99 Cal.App.3d 183, 188; *People* v. *Barbiere, supra,* 33 Cal.App. 770, 776.) Equitable power is generally flexible and expansive; thus equity courts will " 'mold and adjust their decrees as to award substantial justice according to the requirements of the varying complications that may be presented to them for adjudication.' " (*Times-Mirror Co.* v. *Superior Court* (1935) 3 Cal.2d 309, 331 [44 P. 547], quoting *Humboldt Sav. Bank* v. *McCleverty* (1911) 161 Cal. 285 [119 P. 82]; cf. *Crain* v. *Electronic Memories & Magnetics Corp.* (1975) 50 Cal.App.3d 509, 524 [123 Cal.Rptr. 419].) Thus, the act has been interpreted as vesting "the equity side of our courts" with a broad discretion to fashion appropriate remedies to abate nuisances and "afford the relief to which the public are entitled under the act." (*Barbiere, supra,* 33 Cal.App. at p. 776; see also *Selowsky* v. *Superior Court* (1919) 180 Cal. 404 [181 P. 652].)

The court below sought to fashion a just remedy which would afford the People the relief to which they are entitled and would not permit a conceded violation of the act to go unsanctioned. The act, as earlier noted, gives the trial court a panoply of equitable remedies, many of which are punitive. That the court chose to describe the monetary sanction as "damages" is not determinative. A court of equity may award damages as an incident of its relief (see generally 30 C.J.S., Equity, §§ 71, 72, p. 935 et seq.), or as an alternative to injunction or other equitable remedies (see and cf. *Kornoff* v. *Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 270 [288 P.2d 507] [damages awarded when injunctive relief inadequate to abate nuisance]; *Alderson* v. *Cutting* (1912) 163 Cal. 503, 506 [126 P. 157] [damages in lieu of injunction]; *Alexandrou* v. *Alexander* (1974) 37 Cal.App.3d 306, 320 [112 Cal.Rptr. 307] [damages awarded when complaint sought equitable relief]; *Potrero Homes* v. *Western Orbis Co.* (1972) 28 Cal.App.3d 450, 456 [104 Cal.Rptr. 633] [same]; *Morgan* v. *Veach* (1943) 59 Cal.App.2d 682, 693-694 [139 P.2d 976] [same]; see also Code Civ. Proc., § 580). As earlier noted, however, damages are inappropriate in a public nuisance action brought by a public attorney. Nevertheless, I think the monetary sanction imposed here may be viewed as an equitable penalty which, as I have explained, bore a reasonable relationship to the preventative and penal

objectives of the act. It is important to observe that the monetary sanction in this case was, as one court put it, "an act of grace toward the defendants, . . ." (*Morgan* v. *Veach, supra,* 59 Cal.App.2d at p. 694), as it cannot be disputed that defendants would have been more severely penalized had the court closed the premises and ordered their personal property sold.[6] A court acting in equity may impose sanctions less drastic than those permitted by statute. Indeed, the majority agrees that the closure language in the statute appears mandatory but has long been interpreted to be discretionary. (*Selowsky* v. *Superior Court, supra,* 180 Cal. 404, 412-413.) The lower court acted in an eminently equitable fashion by affording relief to the People while at the same time protecting the innocent tenant.

It is true that the act does not expressly authorize the imposition of monetary sanctions. As the majority notes, the statute permits the recovery of "costs" only from the sale of property. Nevertheless, the statute should not be read, as the majority has done, so that its purpose is frustrated. In the absence of any express legislative restriction, I would find such a monetary sanction proper as applied to the facts of this case. The majority's contrary holding permits defendants to escape all liability, thus seriously impairing the People's interest in regulating public nuisances like prostitution. (Cf. Pen. Code, § 4.) The majority reasons that the Legislature, by specifically empowering the People to seek

---

[6]The majority argues that "one year's rent for the entire building, . . ." is too harsh a sanction. (*Ante,* at p. 332, fn. 6.) Presumably, the more severe closure remedy would also not be "the sensitive approach." (*Ibid.*) Of course, the whole building can be closed under the act, even if parts of it were not used for the proscribed purposes. (*People* v. *Smith* (1920) 48 Cal.App. 253 [191 P. 996].) Moreover, because of the changed circumstances on remand, the injunction suggested by the Court of Appeal was no longer feasible. Closure, however, would have been an available remedy because the law of the case is that "the building [was] a place used for the purpose of prostitution" and therefore "subject to the provisions of the [act]." (*American Art I, supra,* 75 Cal.App.3d at p. 529.) The publication activity constituted virtually the sole purpose for which the building was used because the acts of prostitution were arranged to be consummated elsewhere. (*Id.,* at p. 528.) This fact was not determinative, however, as the first appeal found that the "record established conclusively" that regulation pursuant to the act was appropriate. (*Id.,* at p. 531.) The record—discussed at length by the concurring justice in *American Art I*—belies the majority's conclusion that the activity protected by the First Amendment "left little room for the abatable activity." Although models were not photographed in the building ". . . the Lassen Street premises were the 'nerve center' which orchestrated a vast prostitution operation and from which the solicitation, direction, payment, overseeing, and record keeping of hundreds of acts of prostitution were conducted." (*Id.,* at p. 547; conc. opn. of Hanson, J.) The "magnitude of the prostitution operation" (*id.,* at p. 551) is reflected in the fact that "the names of the 'models' were kept in file cards numbering in the thousands" (*id.,* at pp. 536-537, fn. 4), and that models from throughout the state were recruited "to meet the requirements for approximately 22 American Art magazines per month" (*ibid*). Further, defendants' organization has had a history of changing locations and corporate names, apparently in part to avoid prosecution. (*Id.,* at pp. 534-535.) At the first trial—which lasted 20 days—a police sergeant testified that obscenity prosecutions (see *People* v. *Fixler, supra,* 56 Cal.App.3d 321] had not been successful in curbing the prostitution operations of American Art. (75 Cal.App.3d at p. 533, fn. 2.) On this record, closure would certainly have been justified absent the lease. The much less severe monetary sanction imposed by the court was indeed "an act of grace."

injunction and/or closure and declining to expressly provide for monetary sanctions, intended that the latter, less harsh remedy not be available to the People. This literal construction in effect operates contrary to legislative intent and exempts from the act defendants, like the ones in the present case, who are able to change, with chameleon-like ease, their corporate identity and move the headquarters of their empire elsewhere. (See *American Art I, supra,* 75 Cal.App.3d 523, 534-539; conc. opn. of Hanson, J.) The majority's invitation to the People to file a new action if defendants continue their prostitution business elsewhere rings hollow; the lesson to be learned by defendants from today's decision is that to obtain immunity, they should litigate the matter until an adverse judgment is entered against them, at which time they can change locations while an appeal is pending.

Yet, remedies may be appropriate even if not specifically authorized by statute. (*People* v. *Superior Court* (*Jayhill*) (1973) 9 Cal.3d 283 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191].) *Jayhill* involved an action by the Attorney General for unfair competition (Civ. Code, § 3369) and false and misleading advertising (Bus. & Prof. Code, § 17500). With respect to the latter, the Attorney General sought injunctive relief and, in the same action, restitution for nonparty victims of the fraudulent advertising. Business and Professions Code section 17535 provided for injunctive relief but, as we observed, "was silent as to the power of the trial court to order restitution. . . ." (*Id.,* at p. 286.) Nonetheless, this court declared that "[o]n the other hand the statute did not restrict the court's general equity jurisdiction 'in so many words, or by a necessary and inescapable inference' . . .[,]" and that "[i]n the absence of such a restriction a court of equity may exercise the full range of its inherent powers in order to accomplish complete justice between the parties, . . ." (*Ibid.,* citations omitted.) Accordingly, this court held that the trial court had inherent power to order defendants to make restitution to nonparty victims. Because there is no express restriction on the court's equity power in this case, I would hold, like the court in *Jayhill,* that the trial court had the "inherent power" to impose the monetary sanction on defendants. As in *Jayhill,* this result promotes the legislative intent which, it has been held, should "be given effect, even though it may not be consistent with the strict letter of the statute." (*People* v. *Black* (1941) 45 Cal.App.2d 87, 94 [113 P.2d 746].)

I recognize though that *Jayhill* also held that damages were unavailable under Civil Code section 3369. With respect to this latter action for unfair competition, the Attorney General sought "exemplary damages" on behalf of the people of the state, not on behalf of the victims. We did not permit these nonstatutory "exemplary damages." (But see *United Farmworkers of America* v. *Superior Court* (1975) 47 Cal.App.3d 334, 344-345 [120 Cal.Rptr. 904] [equity court has inherent power to award compensatory and punitive damages

for unfair competition].)[7] To hold otherwise would have subjected the *Jayhill* defendants to multiple liability because, as the opinion later observes, the Attorney General was already seeking a civil penalty of $2,500 for each violation under Business and Professions Code section 17536. (9 Cal.3d at p. 288.) Here, the trial court imposed the only possible remedy available against defendants. Moreover, as I have indicated, I view the monetary sanction as a type of penalty, not damages. In *Jayhill,* the Attorney General sought exemplary damages "to punish those who engage in unfair competition." (*Id.,* at p. 287.) However, Civil Code section 3369 provided only for injunctive relief and not for "the equivalent of a civil penalty" (*ibid.*), though, as the *Jayhill* court noted, the Legislature subsequently enacted an amendment providing for a civil penalty not to exceed $2,500. (*Id.,* at p. 287, fn. 2; see Bus. & Prof. Code, § 17536.) By contrast, the Red Light Abatement Law has allowed from its enactment various punitive sanctions. Thus, because the act is both penal and equitable in nature, an equitable penalty is especially appropriate here. *Jayhill* or any other case disallowing *damages* in the context of a civil statute which does not provide for penalties or forfeitures would not control this case.[8]

In my judgment, the majority has circumscribed the power of an equity court to render justice in novel situations. Today's decision violates the maxim that a court of equity has discretion to determine the nature and scope of allowable relief and "may avail itself of powers broad, flexible and capable of being expanded to deal with novel cases and conditions." (*MacFarlane* v. *Peters* (1980) 103 Cal.App.3d 627, 631 [163 Cal.Rptr. 655].) Although I would not allow monetary sanctions as a general rule, I think the trial court acted within its equitable power under the factual circumstances of this case. The court understandably felt compelled to afford relief when, as a matter of law, defendants were in violation of the act. As the dissenting justice in the Court of Appeal opinion below observed: "The 'hit and run' tactics frequently employed by similar defendants in abatement proceedings are deplorable and demand a

[7]*United Farmworkers* involved the unauthorized use by defendant agricultural corporations of petitioner union's insignia, a black eagle. The Court of Appeal implicitly recognized that in some cases the restitution remedy authorized by *Jayhill* would be insufficient to provide plaintiffs with complete equitable relief or to prevent defendants from profiting from a statutory violation; accordingly, the court held that exemplary damages would be proper in such a case. In discussing Civil Code section 3369, the court noted that "[t]he fact that [such] statutes sound in equity and by their terms do not specify that damages may be awarded does not bar recovery of damages in a proper case even though the action be one in equity rather than law." (47 Cal.App.3d at p. 344.) It would appear significant that subdivision 1 of section 3369 provides that "[n]either specific nor preventative relief can be granted to enforce a penalty or forfeiture in any case, nor to enforce a penal law, *except in a case of nuisance or unfair competition.*" (Italics added.)

[8]For example, in *General Motors Accept. Corp.* v. *Kyle* (1960) 54 Cal.2d 101 [4 Cal.Rptr. 496, 351 P.2d 768], a case cited and quoted by the majority, this court made clear that nonstatutory penalties will not be imposed by courts where the Legislature did *not* intend "to tacitly impose" harsh sanctions or forfeitures. (*Id.,* at p. 111; citing *City Lincoln-Mercury Co.* v. *Lindsey* (1959) 52 Cal.2d 267, 276 [339 P.2d 851].)

response." Now that the majority holds that monetary sanctions are not available to the court, "the fashioning of a remedy by which to thwart such tactics is a task . . . left to the Legislature."

My review of the applicable case law and the available indicia of legislative intent—combined with the analogous nature of the monetary sanction and the closure-sale remedy—leads me to the conclusion that the trial court acted properly.

I would affirm.

Respondent's petition for a rehearing was denied March 2, 1983.